884 F.2d 62
 Laurel HUBERMAN, and all others similarly situated,
Plaintiff-Appellant,
v.
Cesar PERALES, Commissioner of the New York State Department
of Social Services, and William J. Grinker, Commissioner of
the New York City Department of Social Services, Richard E.
Lyng, Secretary of the United States Department of
Agriculture, Defendants-Appellees.
 No. 1058, Docket 89-6024.
 United States Court of Appeals,
Second Circuit.
 Argued April 26, 1989.
Decided Aug. 23, 1989.
 
 Michael D. Hampden, Bronx Legal Services, Bronx, N.Y., for appellant.
 Bernard W. Bell, Asst. U.S. Atty., S.D.N.Y., New York City (Benito Romano, U.S. Atty. for the S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., S.D. New York City, of counsel), for defendant-appellee Secretary of Agriculture.
 Before OAKES, Chief Judge, and MESKILL and WISDOM*, Circuit Judges.
 WISDOM, Senior Circuit Judge:
 
 
 1
 This case requires the Court to decide whether statutorily-mandated changes in the calculation of food stamp benefits occur on the effective date of the Food Security Act of 1985 or on the date that the Secretary of Agriculture issued regulations carrying out the purposes of the Act. We join the Courts of Appeals for the Sixth and Eighth Circuits in holding that the effective date of the Act set by Congress controls.[1] We reverse the district court's decision granting the Secretary's motion to dismiss, and we order the district court to grant the plaintiff's motion for a partial summary judgment on remand.
 
 
 2
 * The Social Security Administration has declared Laurel Huberman permanently disabled because of a psychiatric condition. She receives disability retirement benefits of $432 each month. She has no other income.
 
 
 3
 In calculating the amount in food stamps a recipient is eligible to receive, the government first deducts certain necessary expenses from the recipient's annual income. Department of Agriculture regulations allow a maximum of $147 as an excess shelter deduction. In the Food Security Act of 1985, Congress mandates that each person receiving permanent disability pensions under Section 221(i) of the Social Security Act have her actual living expenses minus half her income deducted from her income before the amount of her pension is calculated.[2] Use of the "uncapped" deduction for shelter expenses increases Huberman's benefits significantly. When $147 is deducted from her income, she receives $23 in food stamps each month. When the newly-calculated deduction of $372.26 is allowed her, she receives about $80.
 
 
 4
 The dispute in this case is over the starting date to be used in calculating Huberman's benefits. The State began using the actual expense figures on August 1, 1986, the date the Secretary of Agriculture declared as the effective date.[3] Huberman argues that her benefits should have been increased as of December 23, 1985, the date the Food Security Act was signed into law. Huberman relies on Section 1801 of the Act, which says:
 
 
 5
 Except as otherwise provided in this Act, this Act and the amendments made by this Act shall become effective on the date of enactment of this Act.[4]
 
 
 6
 The Secretary relies on Section 1583 of Title XV, which authorizes use of actual living expenses:
 
 
 7
 Not later than April 1, 1987, the Secretary [of Agriculture] shall issue rules to carry out the amendments made by this title.[5]
 
 
 8
 The Secretary issued the regulations on May 21, 1986, with instructions that they become effective between June 20, 1986 and August 1, 1986.
 
 
 9
 Huberman brought suit against several state and municipal officials on December 5, 1986; she later named the Secretary of Agriculture as a defendant. On September 14, 1988, the district court denied Huberman's motion for a partial summary judgment and granted the Secretary's motion to dismiss. After negotiations between Huberman and the state and municipal defendants, the court entered final judgment dismissing the suit on December 27, 1988. This appeal follows. The state and municipal defendants are not parties to the appeal.
 
 II
 
 10
 This case turns on the meaning of the phrase "effective date". Huberman argues that the Act's effective date marks the beginning of her entitlement to the uncapped shelter allowance. The Secretary counters that the effective date referred to in the statute merely obliges him to begin formulating regulations implementing the Act.
 
 
 11
 First, of course, we look at the language of the Act.[6] We find that the Secretary's interpretation does violence to its plain meaning. Section 1801 says that "except as otherwise provided in this Act", the effective date of each provision is December 23, 1985, the date of enactment. Section 1504, the provision at issue here, does not name an effective date later than December 23, 1985. That fact alone suggests that December 23, 1985 is the relevant date.[7]
 
 
 12
 Also of importance are the four provisions in Title XV, the section of the Act that concerns food stamps, that do have effective dates after December 23, 1985.[8] The Secretary argues that Congress wished him to complete drafting regulations for those sections by the separate effective dates included in each section. Appellee's Brief at 42-45. The Secretary's interpretation of the provision at issue in this case, conversely, is that Congress intended the effective date of December 23, 1985 to begin the process of drafting regulations. There is no evidence that Congress intended the word "effective" to have two different meanings in two different contexts. Indeed, wherever possible, we must interpret the Act so that its terms are internally consistent. In order for the Secretary to advance a consistent interpretation of the "effective date" provisions, he must ask us to believe that these later effective dates were intended to begin the process of drafting regulations. We think it more likely that Congress would tell the agency to start implementing upon enactment and would specify when implementation must be complete: There is good reason to lengthen the Secretary's time to carry out these particular provisions, and little reason to shorten it. Section 1511, which has an effective date of May 1, 1986, commands agencies administering the food stamp program to gather information about recipients' automobiles; Section 1514, also effective on May 1, demands information about their utility payments and household repair costs, among other things. These provisions call upon the information-gathering expertise of administering agencies. Section 1531, effective October 1, 1986, commands social security offices to disseminate information about the food stamp program and to assist recipients of social security insurance in completing simplified application forms. It would, of course, take time for the Secretary to negotiate this arrangement with the Secretary of Health and Human Services, who administers those offices.[9] Section 1542 forbids the transfer of food stamp funds to the Office of the Inspector General or to the Office of the General Counsel in the Department of Agriculture; it is made effective on October 1, 1986, near the end of the fiscal year, giving agencies time to arrange other funding.
 
 
 13
 The time needed to adopt regulations carrying out these four provisions contrasts sharply with the ministerial change that benefits Huberman. This amendment requires the food stamp program to consider her actual living expenses (minus half her income), if she is declared disabled by the Social Security Administration. It requires no discretion or judgment of officials in the food stamp program.[10] The Secretary himself acknowledged as much by declaring the rules implementing it "interpretative".[11] The Administrative Procedure Act (APA) allows him to do so only when he is expressing the intent of Congress and not promulgating a rule under his own rulemaking authority.[12] We cannot find, and the Secretary does not offer, a credible reason for Congress to provide the Secretary fifteen months to carry out this simple change while allowing much less time for more complex changes.
 
 
 14
 The legislative history and purposes of the bill support Huberman's position. The Senate bill authorized the Secretary to promulgate interim regulations no later than March 1, 1986; these regulations would be exempt from notice-and-comment rulemaking, which would occur after they were in place.[13] The Senate intended this provision to avoid lawsuits over rulemaking procedure;[14] at least, the interim regulations would have the effect of postponing litigation until after the amendments were up and running.[15] As a result, increases in benefits would reach recipients quickly. The House-Senate conference replaced the Senate's proposal with the Act's requirement that all final regulations be issued by April 1, 1987.[16] The Secretary infers that the conference intended to permit delay in increasing benefits by allowing him to forgo interim regulations issued by March 1, 1986, in favor of final regulations issued by April 1, 1987. Both the House and the Senate, however, wanted the more generous food stamp calculations put in place quickly.[17] Congress wrote the 1985 uncapped shelter allowance provision to incorporate determinations made by the Social Security Administration "so that it is simple to administer--i.e., so that food stamp eligibility workers need not administer a disability test, but can rely on information derived from Federal disability programs."[18] The simplicity of the provision intimates that Congress intended it to take effect as quickly as possible, long before the April 1, 1987 deadline for implementation.[19]
 
 
 15
 Finally, the Secretary's interpretation runs counter to the usual use of "effective date" and "implementation date" in congressional statutes. In the 1977 amendments to the Food Stamp Act, Congress declared that
 
 
 16
 The provisions of the Food Stamp Act of 1964, as amended, which are relevant to current regulations of the Secretary governing the food stamp program, shall remain in effect until such regulations are revoked, superseded, amended, or modified by regulations issued pursuant to the Food Stamp Act of 1977.[20]
 
 
 17
 Similarly, in the 1981 amendments Congress expressly collapsed the effective date into the implementation date. The new amendments, Congress said,
 
 
 18
 shall be effective and implemented upon such dates as the Secretary of Agriculture may prescribe, taking into account the need for orderly implementation.[21]
 
 
 19
 A year later, in Sepulveda v. Block,[22] this Court contrasted the 1981 amendments to their 1982 successors, which did not allow the Secretary to determine the effective date of the amendments.[23] At the time it passed the 1985 amendments, then, Congress had shown in previous acts that it knew how to confer on the Secretary the authority to delay effective dates. After Sepulveda, it was presumably aware that courts, at least this Court, would look on its language as dispositive of the question now before us. Its failure to use the language of the 1977 and 1981 amendments in 1985 therefore strongly supports Huberman.[24]
 
 
 20
 The Secretary argues that, even if there is some evidence that Congress intended that benefits be calculated using the revised excess shelter deduction from December 23, 1985, there is not enough evidence to overturn his decision to the contrary. He relies on two canons of statutory interpretation that, he contends, increase the amount of evidence necessary to reject his interpretation of the Act. He first argues that we must defer to his interpretation. It is of course true that courts should give weight to an agency's interpretation of the statutes it administers.[25] The issue before us, however, does not implicate the agency's expertise. The Secretary admitted as much when he labelled his regulations "interpretative" to avoid notice-and-comment rulemaking procedures. We need not defer to the Secretary's interpretation, therefore,[26] as the conclusions we reach tilt us strongly in the other direction.[27]
 
 
 21
 The Secretary next notes that retroactive regulations must be specifically authorized by Congress.[28] He avers that, whatever evidence of congressional intent there is, there is not specific authorization. We conclude that this canon of construction is inapplicable, because the regulations in question are not retroactive. The regulations do not alter any rights, entitlements, or responsibilities extant before they were issued; nor do they confer a benefit or impose a penalty based upon behavior or status prior to their issuance.[29] Instead, they merely report a change previously made by Congress. It is of great import that the Secretary labelled the regulations interpretative when he issued them. Interpretative rules are the Secretary's opinion about the meaning of the statute and report what Congress has done. They contrast with substantive rules, which create extrastatutory obligations and derive from the Secretary's lawmaking authority.[30] By declaring the implementing regulations interpretative, the Secretary expressed his judgment that Congress had already made the changes in Huberman's entitlements, and that his regulations did not make such a change, retroactive or otherwise.[31] Of course, the Secretary's label does not bind us. We conclude, however, that his contemporaneous judgment was correct, and that the ministerial changes in calculations reported in the regulations did not make the regulations an act in retroactive administrative law making. We therefore do not need to determine whether there is evidence that Congress specifically authorized retroactive regulations.
 
 
 22
 We recognize that, as a result of our decision, Huberman will receive a lump sum payment for the period from December 23, 1985 to August 1, 1986, when it is undisputed that she is entitled to larger payments. Delays in passing increased benefits to recipients are inevitable when Congress makes the change. They do not make congressionally-mandated changes "retroactive", however. Finally, we note that the Secretary declared that regulations implementing several provisions of Title XV of the Act were to be applied retroactively.[32] These provisions obviously do not settle the issue for the provision before us today. The Secretary's decision to give some of the amendments retroactive effect demonstrates, however, that decisions as to when entitlements to an amendment arise must be made by attention to the policies underlying each individual provision. Our analysis of Section 1504(2), which expands the category of those eligible for the uncapped shelter allowance, persuades us that it takes effect on December 23, 1985.
 
 III
 
 23
 We decide that when Congress declared that the Food Security Act of 1985 would take effect on the date of enactment, it intended to do more than to oblige the Secretary of Agriculture to begin drafting regulations. It intended a quick change in the calculation of food stamp benefits, so that people who had been declared permanently disabled by the Social Security Administration would soon receive the benefit of deduction of their actual shelter expenses. To Laurel Huberman, that is worth a nearly four-fold increase in her food stamp benefits.
 
 
 24
 The judgment granting the motion to dismiss is REVERSED. Huberman's motion for partial summary judgment is GRANTED with respect to the issues discussed here. The case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 Of the United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 Lynch v. Lyng, 872 F.2d 718 (6th Cir.1989) (recipients entitled to have 1985 Act's new allowance for medical expenses calculated from December 23, 1985), rev'g Lynch v. Min, 684 F.Supp. 498 (M.D.Tenn.1988); Metzer v. Lyng, 864 F.2d 75 (8th Cir.1988) (recipient entitled to have origination fee for student loan deducted from income as of December 23, 1985), aff'g 687 F.Supp. 454 (D.Minn.1987). See also Brooks v. Min, No. 86-2577, 1988 WL 156283 (W.D.Tenn. July 6, 1988) (amendments to requirement that recipients certify they are looking for work take effect December 23, 1985); London v. Department of Health & Rehabilitative Services, 502 So.2d 57 (Fla.1987) (deduction from income for educational expenses becomes effective December 23, 1985). But see Phillips v. Lyng, No. 86-1028C, 1987 WL 54413 (W.D.N.Y. July 16, 1987), aff'd mem., 847 F.2d 835 (2d Cir.1988) (table) (work registration requirements became effective on implementation date, January 30, 1987)
 
 
 [2]
 Food Security Act of 1985, Pub.L. No. 99-198, Title XV, Sec. 1504(2), December 23, 1985, 99 Stat. 1354, 1567 (codified at 7 U.S.C. Sec. 2012(r)(3) (1988))
 
 
 [3]
 The path to $81 was not smooth. On May 21, 1986, the day the Secretary promulgated the regulations implementing Title XV, the State of New York calculated Huberman's benefits as $81 each month. It used her actual living expenses. On July 31, 1986, the day before the regulations took effect, it recalculated her benefits, this time using the capped shelter allowance of $147; it notified her that she would receive $23 a month in food stamps. She requested a hearing, but one was never held. After she filed this lawsuit, the State recalculated her benefits as $81 a month. She received payment retroactive to August 1, 1986
 
 
 [4]
 Pub.L. No. 99-198, Title XVIII, Sec. 1801, 99 Stat. at 1660 (codified at 7 U.S.C. Sec. 1281 note (1988))
 
 
 [5]
 Id. at Sec. 1583, 99 Stat. at 1595 (codified at 7 U.S.C. Sec. 2011 note (1988))
 
 
 [6]
 Consumer Product Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766, 772 (1980)
 
 
 [7]
 Our conclusion that the language of the Food Security Act belies the Secretary's interpretation receives strong support in the decisions of the Courts of Appeals for both the Sixth and the Eighth Circuits. In Lynch, a panel in the Sixth Circuit held that
 Section 1801 clearly and unambiguously states that, except where otherwise indicated, the amendments contained in the Act, like section 1504, are to become effective on the date of enactment--December 23, 1985. Section 1583 gives the Secretary until April 1, 1987, to implement these new rules, but it nowhere indicates the amendments are to be given an effective date other than that suggested by section 1801. The regular meaning of the words used seems to support plaintiff's interpretation.
 Lynch, at 721. Similarly, Metzer holds that
 The clear language of the Act states that all sections, except as otherwise provided, shall be effective on the date of enactment of the statute. While other sections of Title XV of the Act do contain separate effective dates, nowhere is there any language delaying the effective date of section 1509.
 Metzer, 864 F.2d at 76-77. As we have noted there is no language delaying the effective date of Section 1504(2).
 
 
 [8]
 See Pub.L. No. 99-198, Title XV, Sec. 1511, December 23, 1985, 99 Stat. at 1570 (codified at 7 U.S.C. Sec. 2014(e) (1988)) (effective date of May 1, 1986 for provision changing deductions for home ownership, repair, and utility costs); id. at Sec. 1514, 99 Stat. at 1572 (codified at 7 U.S.C. Sec. 2014(g) (1988)) (effective date of May 1, 1986 for amendment to provisions describing "allowable financial resources which eligible household may own"); id. at Sec. 1531, 99 Stat. at 1582 (codified at 7 U.S.C. Sec. 2020(i) & (j) (1988) (effective date of October 1, 1986 for provision requiring offices administering social security benefits to disseminate information about the food stamp program and to assist applicants for food stamps); id. at Sec. 1542, 99 Stat. at 1589 (codified at 7 U.S.C. Sec. 2027 (1988)) (effective date of October 1, 1986 for provision forbidding transfer of funds to Office of the Inspector General or Office of the General Counsel)
 Section 1564 requires the Secretary to report to Congress semiannually the amount and types of food distributed under the Temporary Emergency Food Assistance Program. It takes effect April 1, 1986. Id. at Sec. 1564, 99 Stat. at 1591 (codified at 7 U.S.C. 612c note (1988)). It does not require regulations to implement. We therefore do not discuss it.
 
 
 [9]
 See id. at Sec. 1531(b)(j)(2), 99 Stat. at 1582 (codified at 7 U.S.C. Sec. 2020(j) (1988)) (requiring Secretary to negotiate with Secretary of Health and Human Services)
 
 
 [10]
 S.Rep. No. 145, 99th Cong., 1st Sess. 232, reprinted in 1985 U.S.Code Cong. & Admin.News 1103, 1676, 1898
 
 
 [11]
 51 Fed.Reg. 18,744 (1986)
 
 
 [12]
 5 U.S.C. Sec. 553(b) (1988). See also K. Davis, 2 Administrative Law Treatise, Sec. 7.10, at 54 (2d ed. 1979) (distinguishing interpretative from legislative regulations)
 The Secretary now argues that the implementing regulations are legislative, not interpretative. The key to determining whether regulations are interpretative or legislative is whether the Secretary thought he was relying on his own legislative power, as delegated by Congress, or merely reporting Congress's expressed intent. What the Secretary said when he issued the regulations is better evidence than are recharacterizations, which might be made with an eye to enhancing the Secretary's position in litigation. See K. Davis, supra, at Secs. 7.10-11. For this reason, the Court of Appeals for the First Circuit has rejected an attempt by the Secretary to recharacterize as "interpretative" regulations promulgated under earlier amendments to the food stamp program after initially labelling them "legislative". Levesque v. Block, 723 F.2d 175, 181-82 (1st Cir.1983). As we discuss below, the regulation at issue in this case reports what Congress has already done; it seems better cast as interpretative. Finally, if we allowed the Secretary to describe the regulations as legislative, we might find it necessary to order notice-and-comment rulemaking. But see Levesque, 723 F.2d at 184 (invoking "good cause" exception of 5 U.S.C. Sec. 553(b)(B) to allow Secretary to forgo notice-and-comment rulemaking). Further litigation, even if limited to this question, hardly seems desirable. It is better to have the Secretary stand by his initial position.
 
 
 [13]
 S. 1714, 99th Cong., 1st Sess. 1460 (1985). See S.Rep. No. 145, supra note 10, at 286, reprinted in 1985 U.S.Code Cong. & Admin.News at 1952
 
 
 [14]
 Id
 
 
 [15]
 The use of interim regulations had succeeded in delaying lawsuits until after changes were in place in the Omnibus Budget Reconciliation Act of 1982. See Sepulveda v. Block, 782 F.2d 363, 364 (2d Cir.1986) setting forth dates establishing that interim regulations allowed Secretary to implement changes before litigation began)
 
 
 [16]
 See Sec. 1801, supra note 4. See also H.R. Conf. Rep. No. 447, 99th Cong., 1st Sess. 562, reprinted in 1985 U.S.Code Cong. & Admin.News 2251, 2488
 
 
 [17]
 See H. Rep. No. 271, Pt. 1, 99th Cong., 1st Sess. 131, reprinted in 1985 U.S.Code Cong. & Admin.News 1103, 1235 ("steps must be taken now to address the domestic hunger problem"); Lynch, at 721-22
 
 
 [18]
 S.Rep. No. 145, supra note 10, at 232, reprinted in 1985 U.S.Code Cong. & Admin.News at 1898. See also H. Rep. No. 271, Pt. 1, supra note 17, at 139, reprinted in 1985 U.S.Code Cong. & Admin.News at 1243
 
 
 [19]
 The Secretary misreads S. 1714. It would not have made the Act effective when the Secretary prescribed. Instead, it allowed the Secretary to dictate when changes in the interim regulations would take effect: "Any change in the interim regulations made in final regulations would be effective on the date(s) prescribed by the Secretary." H. R. Conf. Rep. No. 447, supra note 16, at 562, reprinted in 1985 U.S.Code Cong. & Admin.News 2488
 
 
 [20]
 Food and Agriculture Act of 1977, P.L. 95-113, Title XIII, Sec. 1303(a), September 29, 1977, 91 Stat. 913, 979 (codified at 7 U.S.C. 2011 note (1988))
 
 
 [21]
 Omnibus Budget Reconciliation Act of 1981, P.L. 97-35, Title I, Sec. 117, August 13, 1981, 95 Stat. 357, 366 (codified at 7 U.S.C. 2012 note (1988))
 
 
 [22]
 782 F.2d 363 (2d Cir.1986)
 
 
 [23]
 Id. at 366 n. 4
 
 
 [24]
 In 1988, Congress declared that amendments to the Food Stamp Act would become effective and be implemented on the same day. Hunger Prevention Act of 1988, Pub.L. No. 100-435, 102 Stat. 1645. We do not use the 1988 statute to cast light on Congress's intent in the 1985 Act. It demonstrates again Congress's facility with effective dates and implementation dates and thus supports the interpretation of the 1985 Act that imputes that facility to it
 
 
 [25]
 See Aluminum Co. of America v. Central Lincoln People's Utility Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 81 L.Ed.2d 301, 309 (1984)
 
 
 [26]
 See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694, 703 (1984) (deference necessary only to legislative regulations, which require agency's expertise and experience)
 
 
 [27]
 See Chemical Mfrs. Ass'n v. Natural Resources Defense Council, 470 U.S. 116, 126-134, 105 S.Ct. 1102, 84 L.Ed.2d 90, 99-104 (1985) (examining legislative history, purpose, and language of statute to determine if they override agency interpretation)
 
 
 [28]
 K. Davis, supra note 12, at Sec. 7.23, at 1098 (retroactive regulations must be "specifically authorized")
 
 
 [29]
 See id. at (defining retroactive regulations)
 
 
 [30]
 See, e.g., American Hospital Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C.Cir.1987) (interpretative rules merely describe what statute already did); Alcaraz v. Block, 746 F.2d 593, 613 (9th Cir.1984) (rules implementing OBRA 1981 were properly classified as interpretative because they "simply explained what the statute already required")
 
 
 [31]
 The Secretary later recharacterized the regulations as substantive. We rely on his initial label, because it is the more accurate of the two. See also note 12, supra
 
 
 [32]
 See, e.g., Secs. 276.7(j), 279.10(d), 51 Fed.Reg. 18,748 (1986) (judicial review provisions made retroactive to December 23, 1985)