235 F.3d 80 (2nd Cir. 2000)
 NANCY SWEET, Individually and as Mother and Natural Guardian of Thomas Sweet a/k/a Thomas Brown, Plaintiff-Appellee,
v.
ROBERT SHEAHAN, Defendant-Appellant,
AMERICAN CYANAMID COMPANY, Successor in interest to MacGREGGOR LEAD COMPANY, ATLANTIC RICHFIELD COMPANY, EAGLE-PICHER INDUSTRIES, INC., LEAD INDUSTRIES ASSOCIATIONS, INC., N.L. INDUSTRIES, INC., SCM CORPORATION, as Successor in interest to the GLIDDEN COMPANY, SCM CHEMICALS, INC., f/k/a SCM PIGMENTS and GLIDDEN PIGMENTS, THE GLIDDEN COMPANY, THE O'BRIEN CORPORATION, d/b/a FULLER-O'BRIEN PAINTS, THE SHERWIN WILLIAMS COMPANY, and E.I. DUPONT DE NEMOURS & CO., Defendants.
 Docket No. 00-7350
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: October 19, 2000
Decided: December 13, 2000
 
 Defendant appeals a decision of the District Court for the Northern District of New York (David N. Hurd, J.), denying his motion to dismiss plaintiff's claim on the grounds that the regulations creating defendant's duty to plaintiff were not in effect at the time that plaintiff's claim accrued. Reversed and Remanded with Instructions to Dismiss.[Copyrighted Material Omitted]
 GARY C. HOBBS, Poklemba, Hobbs & Ulasewicz, LLC, Saratoga Springs, NY for Plaintiff-Appellee Nancy Sweet.
 JAMES E. CULLUM, McPhillips, Fitzgerald & Cullum LLP, Glens Falls, NY for Defendant-Appellant Robert Sheahan.
 Clarin Nardy Riddle and Charles N. Rock, Rock & Rosmarin, LLP, White Plains, NY submitted a brief for Amici Curiae The National Multi-Housing Council, et al.
 Laurene K. Janik, Ralph W. Holmen, Finley P. Maxson, National Association of REALTORS Institute of Real Estate Management, Chicago, IL, submitted a brief for Amicus Curiae National Association of REALTORS Institute of Real Estate Management.
 R. Justin Smith and Bruce Nilles, Attorneys, U.S. Department of Justice, Washington D.C., and Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Div. submitted a brief for Amicus Curiae United States of America.
 Before: CABRANES, POOLER, KATZMANN, Circuit Judges.
 Introduction
 KATZMANN, Circuit Judge:
 
 
 1
 Defendant Robert Sheahan ("Sheahan" or "defendant") appeals a decision of the District Court for the Northern District of New York (David N. Hurd, J.), which denied his motion to dismiss plaintiff's claim. Plaintiff Nancy Sweet, individually and on behalf of her son Thomas Brown ("plaintiff" or "Sweet"), brought suit against defendant on the grounds that, inter alia, defendant failed to provide her with warnings about lead-based paint in the apartment defendant rented to her and in which she lived with her son. Plaintiff alleges that defendant's failure to provide the warnings was in violation of the Residential Lead Based Paint Hazard Reduction Act, 42 U.S.C. §§ 4851 4856. Defendant moved to dismiss plaintiff's case, arguing that the regulations creating defendant's duty to warn her about lead-based paint hazards were not in effect at the time that plaintiff's claim allegedly accrued. The district court denied defendant's motion to dismiss. For the reasons set forth below, we reverse and remand with instructions to dismiss.
 
 Facts and Procedural History
 
 2
 Defendant Sheahan owned an apartment located at 59 Elm Street in Glens Falls, New York, and leased said apartment from December 1, 1995, until October 1996, to plaintiff Sweet, who lived there with her infant son Thomas Brown. Sweet claims that Brown was severely injured and hospitalized after he came into contact with lead-based paint, which was allegedly used on both the interior and exterior walls of the leased apartment.
 
 
 3
 On March 30, 1999, Sweet commenced an action against Sheahan on behalf of herself and her infant son. Subsequently, Sweet added as defendants a number of manufacturers of lead-based paint (or their successors-in-interest) and an industry trade association (collectively referred to as "the manufacturer defendants"), by filing an amended complaint. The amended complaint alleges that, as a result of his exposure to lead paint, Thomas Brown suffered permanent injuries to, among other things, his central nervous system. The complaint also claims that defendants have caused Sweet herself "serious physical, mental and cognitive injuries." Sweet asserts one federal cause of action against Sheahan, pursuant to the Residential Lead Based Paint Hazard Reduction Act ("the Lead Based Paint Act" or "the statute"), 42 U.S.C. §§ 4851 4856. This federalclaim is grounded on her allegations that "defendant Sheahan failed to disclose to plaintiffs the presence of any known lead based paint, or any known lead based paint hazards, in the residential housing and failed to provide to plaintiffs any lead hazard evaluation report available to the defendant," and that he failed to provide plaintiffs with a lead hazard information pamphlet or a lead warning statement, pursuant to 42 U.S.C.§ 4852d(a). Sweet also makes numerous state law claims against Sheahan, including claims based in negligence, negligence per se, breach of contract and implied warranty of habitability, strict product liability, and strict liability for ultrahazardous substances. With regard to the manufacturer defendants, the complaint asserts only state law claims.
 
 
 4
 By separate motions, the manufacturer defendants and Sheahan moved to dismiss the complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Sheahan's motion argued that Sweet's purported federal claim against Sheahan is wholly insubstantial because the Lead Based Paint Act did not impose any obligations on Sheahan, who rented to Sweet prior to the effective date of the implementing regulations.[1]
 
 
 5
 By Memorandum-Decision and Order dated November 5, 1999, the district court denied defendant's motion to dismiss. See Sweet v. Sheahan, No. 97-CV-1666, 1999 WL 1011921, at *5 (N.D.N.Y. Nov. 5, 1999). The district court found that, although the applicable regulations themselves may not have been in effect at the time the apartment was leased to plaintiff, the statute itself created a duty on defendant to disclose information about lead-based paint. See id. at *3.
 
 
 6
 After the district court denied his motion to dismiss, Sheahan moved for amendment of the district court's order or, alternatively, for an order certifying the case as one involving a controlling question of law as to which there was substantial ground for difference of opinion, such that Sheahan could present the case for an interlocutory appeal to this court. Pursuant to 28 U.S.C. § 1292(b), the district court agreed to certify the case for an interlocutory appeal, and, on March 30, 2000, this court accepted the appeal. For the reasons set forth below, we reverse the decision of the district court.[2]
 
 Standard of Review
 
 7
 We review the district court's decision on a motion to dismiss under F.R.C.P. 12(b)(1) or 12(b)(6) de novo. See Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997). When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. See id. Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief. See Securities Investor Protection Corp. v. BDO Seidman, LLP, 222 F.3d 63, 68 (2d Cir. 2000), certified question accepted by 95 N.Y.2d 831, 734 N.E.2d 1211 (N.Y. 2000).
 
 Discussion
 I. Statutory and Regulatory Background
 
 8
 Congress enacted the Residential Lead Based Paint Hazard Reduction Act as TitleX of the Housing and Community Development Act of 1992. See Pub. L. No. 102-550, codified at 42 U.S.C. §§ 4851 4856. After setting forth Congressional findings that lead poisoning affected as many as three million children under the age of six, and that the ingestion of household dust arising from lead-based paint was the most common cause of lead poisoning in children, see 42 U.S.C. §§ 4851(1), (4), the Lead-Based Paint Act declares as an objective the development of "a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. § 4851a(1). To implement this goal Congress, inter alia, provided grants to evaluate and reduce lead-based paint hazards in privately owned low-income housing and set forth requirements to ensure that federally owned housing is free from lead-based paint hazards. See 42 U.S.C. §§ 4852, 4822.
 
 
 9
 Additionally, and more directly relevant to the case at hand, the Lead Based Paint Act directs the Secretary of the Department of Housing and Urban Development ("HUD") and the Administrator of the Environmental Protection Agency ("EPA") to promulgate regulations mandating the disclosure of lead-based paint hazards in privately owned housing that is sold or leased. See 42 U.S.C. § 4852d. The statute states that HUD and the EPA "shall," no later than October 28, 1994, "promulgate regulations for the disclosure of lead based paint hazards in target housing which is offered for sale or lease." 42 U.S.C. § 4852d(a)(1). It further specifies that "[t]he regulations shall require that, before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall (A) provide the purchaser or lessee with a lead hazard information pamphlet ; (B) disclose to the purchaser or lessee the presence of any known lead based paint, or any known lead based paint hazards ; and (C) permit the purchaser a 10 day period to conduct a risk assessment or inspection for the presence of lead based paint hazards." 42 U.S.C. § 4852d(a)(1). The statute provides that the regulations "shall" require a lead warning statement in all contracts for the purchase and sale of target housing and details exactly the language to be used in the lead warning statement which will be included in contracts for purchase or sale. See 42 U.S.C. § 4852d(a)(2), (3). Moreover, "[a]ny person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(3). The final provision of the statute states that "[t]he regulations under this section shall take effect 3 years after October 28, 1992" -- i.e., on October 28, 1995. 42 U.S.C. § 4852d(d). The Court notes that this statutorily scheduled effective date was prior to the beginning of Sheahan's lease to Sweet, which commenced on December 1, 1995.
 
 
 10
 On November 2, 1994, five days after the statute required that regulations be promulgated and a little less than a year before they were to take effect, the EPA and HUD (collectively "the agencies") published in the Federal Register proposed regulations entitled "Proposed Requirements for Disclosure of Information Concerning Lead Based Paint in Housing." 59 Fed. Reg. 54,984 (1994). In the "Background" section to the proposed regulations, the agencies acknowledged the statute's requirement that final regulations were to be effective by October 28, 1995, but stated that the agencies could not meet the deadline. Specifically, the agencies noted:
 
 
 11
 Although [Section 4852d(d) ] specified that final regulations should be promulgated no later than October 28, 1994, EPA/HUD will not be able to meet this deadline. It appears that Congress' intent in [the statute] was to provide a year between the promulgation of the final rule, and the effective date of the rule. Congress reasonably could have believed that this year was necessary in order that the real estate industry, landlords, sellers, etc. could become familiar with the rule requirements and set up procedures for compliance. For this reason, EPA and HUD believe that the effective date of the rule should be no earlier than 1 year after promulgation of the final rule, even if this occurs later than October 28, 1995. EPA and HUD believe that this interpretation is the one most consistent with congressional intent.
 
 
 12
 Id. at 54,984 85.
 
 
 13
 Despite this statement in the "Background" section of the proposed regulations, the proposed regulations provided that the proposed disclosure requirements "shall apply to any transaction to sell or lease target housing on or after October 28, 1995." Lead Based Paint Poisoning Prevention in Certain Residential Structures, 59 Fed. Reg. 54997 (1994) (to be codified at 24 C.F.R. § 38.10 and 40 C.F.R. § 745.102). The agencies provided for a period for public comment on the proposed regulations, see 59 Fed. Reg. at 54984. Approximately 200 comments were received, beginning on November 10, 1994, and ending on February 9, 1996. See Requirements for Disclosure of Known Lead Based Paint and/or Lead Based Paint Hazards in Housing, 61 Fed. Reg. 9064, 9066 (1996)
 
 
 14
 After the close of the public-comment period, the agencies published the final regulations in the Federal Register on March 6, 1996 -- some four months after the effective date set by Congress. See id. at 9064. In that announcement, the agencies stated that the final regulations would be effective on September 6 or December 6, 1996, depending on the type of residential structure involved. See id.[3] For owners of one to four residential dwellings, such as Sheahan who owned two residential dwellings, the disclosure requirements set forth in the regulations did not take effect until December 6, 1996 -- a month or so after Sweet and her son had moved out of Sheahan's residence. See id.[4]
 
 
 15
 The agencies cited promulgation delays as the reason for failing to meet the statutory deadline. See id. at 9068-69. In a note responding to public comments regarding the effective date, the agencies stated:
 
 
 16
 While agreeing that this rule addresses an important consumer protection and empowerment goal, EPA and HUD believe that the rule's effective implementation requires an informed and prepared general public and regulated community. EPA and HUD believe that a phase in period is necessary to provide adequate time for the real estate industry, private lessors, and independent housing sellers and lessors to become familiar with the rule requirements and to set up procedures for compliance.
 
 
 17
 Id. at 9068 9069.
 
 II. The Issue
 
 18
 The legal question before the Court is: As of what date did Sheahan become legally obligated to comply with the federal lead-paint disclosure requirements? Was it: (1) October 28, 1995, the date the statute states the regulations would become effective and which was before Sweet leased the apartment from Sheahan; or (2) December 6, 1996, the date set forth by the agencies in the Federal Register and Code of Federal Regulations as the effective date of the regulations? If the answer is the former, then Sheahan would have owed a duty of disclosure to Sweet and subject matter jurisdiction would exist, but if the latter date is applicable, then Sweet's federal claim would have no basis and subject matter jurisdiction would be lacking.
 
 
 19
 After careful consideration of the district court's opinion and reasoning, the arguments of the parties and the amici curiae, the language of the statute and regulations, the corresponding legislative history, the relevant case law, and helpful commentaries, we hold that Sheahan's duty of disclosure did not accrue before December 6, 1996, the date the agencies established as the effective date for the regulations. Therefore, Sweet's federal claim against Sheahan is without a basis in the law, and federal jurisdiction is lacking.
 
 
 20
 Our finding for defendant rests on three interrelated conclusions. First, the plain language of the statute establishes that the EPA and HUD had an obligation to promulgate regulations that implemented the disclosure obligations; the statute itself does not create such obligations on property owners. Our conclusion that the regulations, and not the statute, created the enforceable obligations on private parties is supported by the fact that, in the absence of Congressional direction, the agencies were compelled to make a number of decisions in the regulations without which the duties of those private parties would not have been clear. Second, given our holding that the statute did not create enforceable obligations, the only way in which to conclude that Sheahan owed a duty of disclosure to Sweet would be to apply the regulations retroactively. Such an interpretation, however, is disfavored by our precedents, and we cannot so hold. Finally, we note that in devising regulations the agencies imposed additional obligations on homeowners that were not specified by the statute. This fact, among others, suggest that the agencies were engaged in legislative rulemaking, such that the interpretations in the regulations, including the effective date, are entitled to substantial deference from this Court.
 
 
 21
 III. The Statute Does Not Impose a Legal Obligation on Private Parties.
 
 
 22
 The section of the statute concerning disclosure requirements begins by stating:
 
 
 23
 Not later than 2 years after October 28, 1992, the Secretary [of HUD] and the Administrator of the [EPA] shall promulgate regulations under this section for the disclosure of lead based paint hazards in target housing which is offered for sale or lease. The regulations shall require that, before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall -
 
 
 24
 (A) provide the purchaser or lessee with a lead hazard information pamphlet . . . .
 
 
 25
 42 U.S.C. § 4852d(a)(1) (emphasis added).
 
 
 26
 The statute obligates the EPA and HUD to promulgate regulations. The obligations of sellers and lessors stem from the regulations to be promulgated by the agencies: "The regulations shall require . . . ." Thus, the statute imposes obligations on the agencies to promulgate regulations which will then -- and only then -- imposeobligations on sellers and lessors. Sheahan thus had no disclosure obligation until the regulations became effective.[5]
 
 
 27
 We thus respectfully disagree with the interpretation of the district court, which held that the "plain language of [the statute] supports plaintiff's position that October 28, 1995 is the controlling date." Sweet, 1999 WL 1011921, at *3. As discussed above, the statutory deadlines are directives to the agencies and do not directly impose duties on sellers and lessors. Thus, although the statute unambiguously states that the regulations are to take effect on October 28, 1995, that provision was rendered unenforceable by the failure of HUD and EPA to promulgate final regulations before that date. Put another way, no regulations became effective on the date set forth in the statute because the agencies did not meet the statutory deadlines.
 
 
 28
 Implicit in our argument is the established point of law that proposed regulations, in this case those issued on November 2, 1994, have no legal effect. See LeCroy Research Sys. Corp. v. Commissioner, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing."); Barton Mines Corp. v. Commissioner, 446 F.2d 981, 990 n.4, 993 n.7 (2d Cir. 1971) (refusing to consider import of proposed regulations in rendering decision); Wuillamey v. Werblin, 364 F. Supp. 237, 243 (D.N.J. 1973) (a proposed rule does not have "the force of law"); cf. 5 U.S.C. § 553(d) (requiring at least 30 days between publication of a rule and its effective date). By design, rulemaking -- proposed rules, followed by notice and comment, leading to final rules -- is a process of graduated decision-making resulting in final regulations. It would make little sense for this court to short-circuit the process by giving effect to what were merely meant to be proposed regulations.
 
 
 29
 We further note that Congress provided a remedy for those aggrieved by the agencies' failure to promulgate regulations within the time frame specified by the statute. Specifically, the statute allows for suit in federal court against the Secretary of HUD and Administrator of the EPA to compel said agencies to promulgate the regulations required in the statute. See 42 U.S.C. § 4852d(a)(5). The fact that the Congress provided this remedy to address agency delay in promulgating regulations, rather than providing, as Congress has done in other statutes, that the duty of disclosure begins in some modified form on the specified date, also suggests that Congress did not intend that the duty of disclosure commence in the absence of the specified regulations. Compare 42 U.S.C. § 4852d, with 42 U.S.C. § 11023(g)(1) (establishing that, if the EPA failed to promulgate a standard form on which to provide information regarding toxic chemical releases, those targeted by the statute must provide the information on an alternative, back-up form designated in the statute). See generally M. Elizabeth Magill, Congressional Control over Agency Rulemaking: The Nutrition Labeling and Education Act's Hammer Provisions, 50 Food & Drug L.J. 149, 150-57 (1995) (discussing Congress' increased use of "hammer" provisions, which prescribe that if the applicable agency has not promulgated final regulations by a certain date, the agency's proposed or interim regulations become effective, or alternatively, depending on the particular legislation, standards set forth in the statute become effective); Richard J. Pierce, Jr., Judicial Review of Agency Actions in a Period of Diminishing Agency Resources, 49 Admin. L. Rev. 61, 81-83, 85-94 (1997) (discussing how courts should address claims brought against administrative agencies for failing to meet statutory deadlines, particularly with regard to the Clean Air Act); R. Shep Melnick, The Political Roots of the Judicial Dilemma, 49 Admin. L. Rev. 585, 589-90 (1997) (discussing Congress' increased used of "hammers" in environmental legislation).
 
 
 30
 Although the statute itself did not impose enforceable obligations on private parties, the agencies, in an effort to fashion a workable scheme, did so through the regulations. In promulgating the final regulations, the agencies refined the class of persons subject generally to the disclosure requirements of 42 U.S.C. § 4852d, exempting, for instance, housing sold at foreclosure sales, leases of housing which have been certified as free from lead-based paint, leases for 100 days or less, and renewal leases when the required disclosures were previously made. See 40 C.F.R. § 745.101(a)-(d); 61 Fed. Reg. at 9067-68 (explaining changes in regulations). The agencies also tinkered with the language of the disclosure requirements to further clarify when and to whom the required disclosures must be given, see 61 Fed. Reg. at 9071 (discussing rules), and added definitions to supplement those provided by the statute. See 40 C.F.R. § 745.103; 61 Fed. Reg. at 9069-71 (explaining added definitions). In sum, without the regulations there would have been confusion concerning to whom the disclosure requirements applied, the form of such disclosures, and the timing of the disclosures.
 
 
 31
 Bolstering our view that the statute itself did not create enforceable obligations on private parties is the fact that Congress anticipated at least a one-year delay between the time the regulations were promulgated and when those regulations would become effective. See 42 U.S.C. § 4852d(a)(1) & (d) (regulations to be promulgated no later than 2 years after October 28, 1992, regulations become effective 3 years after October 28, 1992). In other words, such duties took hold not with the passage of the Lead-Based Paint Act or even after a short interval, but only after a substantial period of time following the issuance of the regulations. If Congress anticipated that the regulations would be a mere reiteration and explanation of the statutory provisions, there would be no reason to build such a delay into the process. The fact that the legislative branch mandated such a delay suggests that it anticipated that the agencies would institute new legal obligations and implement substantial additions and changes in the regulations. In the effort "to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible," 42 U.S.C. § 4851a(1), it appears that Congress provided for such delay in the statute in order to permit private parties to become familiar with the changed legal obligations instituted by the agencies' regulations.
 
 
 32
 IV. Retroactive Application of the Regulations
 
 
 33
 Given our conclusion that the statute itself does not create enforceable obligations on private parties, the only way in which we could find that Sheahan had a duty to provide plaintiff with disclosures regarding lead-based paint hazards would be to conclude that a duty existed under the regulations. We have already explained that such a duty cannot come from the proposed regulations because proposed regulations do not have binding legal effect. See LeCroy Research Sys. Corp., 751 F.2d at 127.
 
 
 34
 Nor, for the reasons discussed below, can we apply the final regulations retroactively. First, a strong presumption exists against the retroactive application of regulations. Retroactive legislation "presents problems of unfairness because it can deprive [parties] of legitimate expectations and upset settled transactions." Eastern Enters. v. Apfel, 524 U.S. 498, 501 (1998). "Retroactivity is not favored in the law. Thus administrative rules will not be construed to have retroactive effect unless their language requires this result." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). In fact, we are "prohibited from applying a regulation to conduct that took place before its enactment in the absence of clear congressional intent where the regulation would 'impose new duties with respect to transactions already completed.'" Rock of Ages Corp. v. Secretary of Labor, 170 F.3d 148, 158 (2d Cir. 1999) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994)).
 
 
 35
 Plaintiff Sweet argues that Congress, by clearly mandating the effective date of October 28, 1995, not only authorized retroactivity but mandated it. We disagree. No express language in the Lead-Based Paint Act requires that the regulations be applied retroactively. The statute mandated that final regulations would take effect on October 28, 1995, but this was necessarily based on the assumption that final regulations would be promulgated by that date.
 
 
 36
 We agree with Sweet that the agencies' failure to promulgate final regulations before the date specified in the Lead-Based Paint Act contravened Congressional intent. However, we cannot remedy the agencies' failure by holding Sheahan liable for allegedly neglecting his disclosure obligations when those obligations did not exist, at least under the federal statute, at the time Sheahan entered into the lease with Sweet. Congress expressly delegated to the agencies the responsibility for developing regulations, and the statutory language makes the private landlords' disclosure obligations contingent on the promulgation of those regulations. Applying a duty of disclosure to Sheahan's lease agreement with Sweet would be unfair because, at the time the lease commenced, Sheahan could not be sure of what his disclosure requirements would be under the forthcoming regulations. See Sipes v. Slaughter, 89 F. Supp. 2d 1199, 1203 (D. Kan. 2000) (faced with the same legal issue raised in this case, finding that the retroactive application of the final regulations was prohibited on grounds of procedural fairness); see generally Landgraf, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). Moreover, applying the regulations to create a duty on Sheahan would require us to override the agencies' specific, stated intention that the regulations not become effective until December 6, 1996. This would be inconsistent with our finding that the regulations are entitled to Chevron deference. See infra Part V.
 
 
 37
 The district court argued that Sheahan would not be prejudiced by requiring his compliance with the disclosure requirements before the final regulations were published.[6] The court stated:
 
 
 38
 The statute specifically set[s] forth the specific conduct required of sellers and lessors, and stated that such conduct would be required on and after October 28, 1995. Furthermore, the proposed regulations, which were published more than one year before Sweet moved into the subject apartment, contained the same basic disclosure requirements and stated that such disclosure would be required in "any transaction to sell or lease target housing on or after October 28, 1995." 59 Fed. Reg. 54997. Sheahan would only be prejudiced if he were held responsible for acts of disclosure contained in the final regulations which were not in the statute or proposed regulations. That is not the case here, however. Sheahan is accused of failing to comply with conduct specifically contained in the Lead Based Paint Act and which is substantially similar in the proposed regulations. Therefore, Sheahan cannot show prejudice.
 
 
 39
 1999 WL 1011921, at *4.
 
 
 40
 We do not accept this argument, which would require Sheahan to comply with the disclosure requirements in the proposed regulations. Until the final regulations were made effective, it was reasonable for individuals to believe that the statute and the proposed regulations placed no obligations on them. See LeCroy Research Sys. Corp., 751 F.2d 123 at 127 ("If the Commissioner wanted this [proposed] regulation to have binding effect, it could have been issued as a temporary regulation .") Supporting such thinking is the language of the 1994 proposed regulations, which directly declared that "EPA and HUD believe that the effective date of the rule should be no earlier than 1 year after promulgation of the final rule, even if this occurs later than October 28, 1995. EPA and HUD believe that this interpretation is the one most consistent with Congressional intent." 59 Fed. Reg. 54,984-85.
 
 
 41
 V. The Regulations Are An Exercise in Legislative Rulemaking and Entitled to Substantial Deference.
 
 
 42
 The district court found that the regulations at issue in this case are interpretive rather than legislative: "[T]he regulations in the instant case merely report and explain the disclosure requirements set forth by Congress", and thus "they are not entitled to any deference." Sweet, 1999 WL 1011921, at *3. We disagree with this conclusion and find that the regulations are legislative and are entitled to substantial deference from this Court. Before we explain our reasoning, however, it is necessary to give a brief overview of the difference between interpretive and legislative rules, and the relevance of this distinction.
 
 
 43
 The distinction between legislative and interpretive rules derives from the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 551 et seq. The APA requires that when an agency engages in rulemaking it provide public notice of the proposed rule, followed by an opportunity for public comment. See 5 U.S.C. § 553(b) & (c). However, the statute permits an exception to the usual notice-and-comment rulemaking procedures when a rule is merely "interpretative, " see 5 U.S.C. § 553(b)(A), often referred to as "interpretive rules." While the APA does not define interpretative (nor interpretive) rules, courts have developed several general formulations in order to distinguish interpretive rules from those that are "substantive" or "legislative,"[7] which must comply with the notice and comment provisions of the APA. See generally Jacob A. Stein et al., 3 Administrative Law, § 15.07[3] at 15-125-126 (1999) (discussing factors used to differentiate interpretive and substantive rules); Elizabeth Williams, What Constitutes "Interpretive Rule" of Agency so as To Exempt Such Action from Notice Requirements of Administrative Procedure Act (5 U.S.C.A. § 553(b)(3)(A)), 126 A.L.R. Fed. 347, § (2)(a) (1995 & 1999 Supp.) (discussing cases); Robert A. Anthony, "Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog, 8 Admin. L.J. Am. U. 1 (1994). In this circuit, we have stated that legislative rules are those that "create new law, rights, or duties, in what amounts to a legislative act." White v. Shalala, 7 F.3d 296, 303 (2d Cir. 1993). "Interpretive rules, on the other hand, do not create rights, but merely 'clarify an existing statute or regulation.'" United States v. Yuzary, 55 F.3d 47, 51 (2d Cir. 1995) (quoting White, 7 F.3d at 303); New York City Employees' Retir. Sys. v. SEC, 45 F.3d 7, 12 (2d Cir. 1995) (same).
 
 
 44
 A more comprehensive test for distinguishing legislative and interpretive rules was set forth by the D.C. Circuit in American Mining Congress v. Mine Safety & Health Administration, 995 F.2d 1106, 1110-12 (D.C. Cir. 1993). In that case the court stated:
 
 
 45
 Accordingly, insofar as our cases can be reconciled at all, we think it almost exclusively on the basis of whether the purported interpretive rule has "legal effect", which in turn is best ascertained by asking (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule.
 
 
 46
 Id. at 1112; see New York City Employees' Retir. Sys., 45 F.3d at 13-14 (discussing the American Mining criteria).[8]
 
 
 47
 Interpretive rules and legislative rules differ in important ways. Legislative rules bind members of the agency and the public, and such rules receive substantial deference from the courts. See Kenneth Culp Davis & Richard J. Pierce, Jr., 1 Administrative Law Treatise ("Treatise") § 6.3, at 233-38 (3d ed. 1994) (citing sources).[9] Indeed, we have stated that "[w]hen Congress delegates to an agency the power to promulgate rules, 'the [agency] adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner....'" United States v. Chestman, 947 F.2d 551, 557-58 (2d Cir. 1991) (quoting Batterton v. Francis, 432 U.S. 416, 425 26 (1977) (second alteration in original)). Legislative rules can impose obligations on members of the public distinct from, and in addition to, those imposed by statute. See Davis & Pierce, Treatise, § 6.3, at 234. Because of the potentially powerful nature of legislative rules, it is essential to recognize that agencies have the power to issue legislative rules only if, and to the extent that, Congress has so authorized. See id.; see also Yuzary, 55 F.3d at 51 (discussing and quoting Treatise).
 
 
 48
 In this case, we find that the regulations are legislative. As reviewed above, the regulations were promulgated pursuant to the explicit statutory authority of the Lead-Based Paint Act. The plain language of the statute anticipates that the regulations themselves will create legal obligations on landlords to disclose lead-based paint hazards. See 42 U.S.C. § 4852d(a)(1) ("The regulations shall require "); see also White, 7 F.3d at 303 (legislative rules create new duties).
 
 
 49
 We disagree with the district court's assessment that the regulations only "report and explain" the requirements set forth by the statute. We acknowledge that the statute is rather explicit in setting forth certain aspects of the disclosure that Congress intended be given. See especially 42 U.S.C. § 4852d(a)(3) (giving the exact language to be required in the "Lead Warning Statement"). Such explicit statutory mandates could weigh in favor of finding that the regulations are interpretive. However, we also note that, in implementing the regulations, the agencies significantly expanded the class of persons who are required to provide the Lead Warning Statement. That is, while the statute only requires that "every contract for the purchase and sale of interest in target housing shall contain a Lead Warning Statement," the regulations add that every contract to lease target housing also must provide the Lead Warning Statement. Compare 42 U.S.C. § 4852d(a)(2), with 40 C.F.R. § 745.113(b); see also Requirements for Disclosure of Known Lead Based Paint and/or Lead Based Paint Hazards in Housing, 61 Fed. Reg. 9064, 9071 (1996) (explaining that the agencies added the requirement that the Lead Warning Statement also be provided in leases). This significant expansion in the persons subject to the legal requirement of providing a Lead Warning Statement is a strong indication that the agencies engaged in legislative rulemaking. See White, 7 F.3d at 303 (legislative rules create new duties); Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 95 (D.C. Cir. 1997) ("[A] substantive rule modifies or adds to a legal norm based on the agency's own authority") (emphasis in original).
 
 
 50
 Furthermore, as discussed above in Part III, in promulgating the final regulations the agencies refined and modified a number of the statutory guidelines. The extent and nature of the ambiguities within the statute both support our earlier holding that the statute itself does not create enforceable obligations and reinforce the conclusion that the regulations are legislative. Also, as noted above, the fact that Congress anticipated at least a one-year delay between the time the regulations were promulgated and when those regulations would become effective suggests that it anticipated that the agencies would institute new legal obligations -- that the agencies would engage in legislative rulemaking. This interpretation of Congressional intent is shared by the agencies' themselves, as stated at the time of the publication of both the proposed and final regulations.[10]
 
 
 51
 In addition, although the statute did not explicitly require the agencies to follow the notice-and-comment process, the agencies provided notice to the public and an opportunity to comment, following the requirements of the APA, 5 U.S.C. § 553(b) -- lending force to the conclusion that the regulations were an exercise in legislative rulemaking. Had the agencies been engaged in interpretive rulemaking, they would have been exempt from the notice-and-comment provisions. Upon review of the comments received by the agencies regarding the proposed regulations, there is no indication that Congress disagreed with the agencies' interpretation that they should be following notice-and-comment procedures. Indeed, a number of congresspersons submitted to the agencies their own comments or those of constituents during the comment period. See OPPTS -62130, Collection of Public Comments on Proposed Requirements for Disclosure of Known Lead Based Paint and/or Lead Based Paint Hazards in Housing, comment C1-012 (Senator Hatfield), C-219 (Senator Lott), obtained from the EPA. This further indicates that the agencies' decision to engage in legislative rulemaking was consistent with Congress' intent.
 
 
 52
 In sum, although the explicit nature of certain parts of the statute could suggest that the regulations are interpretive, the evidence refutes such an argument. Because the rules are legislative, the interpretations contained therein, including the effective date, receive substantial deference from this court. We have stated that "an agency's interpretation of a statute in a legislative rule is binding on a court if the interpretation is a 'permissible construction of the statute.'" Yuzary, 55 F.3d at 51 (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). Given Congress' stated expectation that there would be a year between the promulgation of the final rule and its effective date, the agencies' decision to provide the regulated public six to nine months before the final rule became effective is doubtless a permissible interpretation of the statute. Therefore, the agencies' interpretation, including the effective date, is binding on this court.
 
 
 53
 The legislative nature of the regulations also distinguishes this case from our earlier holding in Huberman v. Perales, 884 F.2d 62 (2d Cir. 1989), upon which the district court relied. In that case, the court analyzed whether a recipient's right to a more generous amount of food stamps began on the effective date of the Food Security Act ("FSA"), or the later effective date of the implementing regulation. See id. at 64. We held that the recipient was entitled to the higher amount of food stamps as of the effective date of the FSA. Id. at 68-69. Our decision relied on the fact that the FSA expressly provided that its provisions became effective upon the date of enactment, unless otherwise provided in the specific provisions. Id. at 64-65. We noted that the provision in question, unlike other provisions, did not specifically provide for a different effective date. Id. at 65-66. Moreover, we emphasized that the Secretary of Agriculture had characterized his department's duty in implementing the relevant provision of the FSA as "interpretive." Id. at 66, n.12, 68. This view made sense to us because the FSA provision at issue was a "ministerial" amendment to the way food stamp benefits were calculated, requiring "no discretion or judgment of officials in the program." Id. at 66. The regulations did not "alter any rights, entitlements, or responsibilities extant before they were issued." Id. at 68. The Court also found that Congress did not expect that the agency would follow notice-and-comment procedures in designing the implementing regulation, and none were followed. Id. at 66-67.
 
 
 54
 The substantial differences between the Huberman case and this one render unavailing the district court's reliance on that case. To begin with, the language of the two statutes is noticeably different. While the Lead Based Paint Act states that "[t]he regulations under this section shall take effect 3 years after October 28, 1992", 42 U.S.C. § 4852d, thus incorporating the regulations into the statute, the FSA declared that "this Act and the amendments made by this Act shall become effective on the date of enactment of this Act." See Huberman, 884 F.2d at 64 (quoting Pub.L. No. 99-198, Title XVIII, § 1801, 99 Stat. at 1660). Even more important are the differences in the nature of obligations mandated by the two statutes. Huberman involved a simple statutory amendment directing the applicable governmental agency to calculate food stamps benefits in a slightly different way, whereas the Lead-Based Paint Act is a major regulatory statute, resulting in substantial new obligations on private parties. We note also that under the Lead-Based Paint Act and implementing regulations, landlords who do not comply with the disclosure requirements are liable for treble damages and can be fined up to $10,000. See 42 U.S.C. §§ 4852d(b)(3), (5); 40 C.F.R. §§ 745.118(c), (f). By contrast, the statute interpreted in Huberman did not create liability for private parties; it merely required the government to provide higher levels of food stamps to needy recipients. Moreover, in contrast to the relatively simple process of promulgating regulations in Huberman, in the case presently before us the agencies published proposed regulations and received approximately 200 comments, which they subsequently considered before promulgating final regulations. For all of these reasons, then, Huberman cannot control the case at hand.
 
 Conclusion
 
 55
 The gravamen of plaintiff's argument and district court's holding is that Congress signaled that the regulations would become effective on the date mandated by the statute. However, the clear language of the statute did not impose obligations on private parties, but rather required the agencies to promulgate the regulations, which in turn created enforceable disclosure requirements on the regulated community. And those regulations did not take effect until after plaintiff and her son moved from defendant's apartment. In such a circumstance, we are bound to yield to the strong presumption against retroactively applying regulations and to give deference to the agencies' interpretation of the statute. Where the regulated community was not responsible for the agencies' delay, we believe in fairness that the regulated community cannot be liable for not complying with regulations yet to take effect.
 
 
 56
 We recognize the strong public interest furthered by allowing plaintiff a chance to recover for her injuries. By requiring regulations, Congress determined that voluntary compliance was insufficient to the task of eliminating the tragic circumstances of the kind present in this case, and that mandatory disclosure, among other means, was necessary to protect the community. See generally Mary Graham, Regulation by Shaming, The Atlantic Monthly, Apr. 2000, at 36 (examining mandatory disclosures in a variety of contexts). And if those final regulations had been in effect, this Court would have been presented with a different case. We again emphasize that our ruling expresses no view on the merit of plaintiff's claim against defendant under state law. Our holding is limited to a finding that plaintiff fails to state a claim under the Lead-Based Paint Act.
 
 
 57
 In conclusion, we find that Sheahan's duty of disclosure did not accrue before December 6, 1996, the date the regulations became effective. Therefore, Sweet's federal claim against Sheahan is without basis in the law, and federal jurisdiction is lacking. The decision of the district court is reversed, and the case is remanded with instructions to dismiss plaintiff's case.
 
 
 
 Notes:
 
 
 [1]
 According to the parties' briefs, plaintiff's claims against the manufacturer defendants have been settled by stipulation, leaving Sheahan as the sole defendant. Sheahan is the only party appealing the district court's decision.
 
 
 [2]
 We emphasize that our decision concerns only plaintiff's federal cause of action under the Residential Lead Based Paint Hazard Reduction Act. In no way should our decision be read as a comment on plaintiff's state law claims against defendant. Specifically, we do not address the effect the Residential Lead Based Paint Hazard Reduction Act might have on defendant's disclosure duties under state common law.
 
 
 [3]
 See also 40 C.F.R. § 745.102 (1996), stating:
 The requirements in this subpart [setting forth disclosure requirements for lead-based paint] take effect in the following manner:
 (a) For owners of more than four residential dwellings, the requirements shall take effect on September 6, 1996.
 (b) For owners of one to four residential dwellings, the requirements shall take effect on December 6, 1996.
 
 
 [4]
 In sum, the timeline is as follows:
 1994
* October 28 CONGRESS states regulations are to be promulgated by this date.
* November 2 The AGENCIES publish proposed regulations in the Federal Register.
1995
* October 28 CONGRESS states regulations are to become effective by this date.
* December 1 Sweet's lease commences.
1996
* March 6 The AGENCIES publish the final version of the regulations, announcing
 that they would become effective on September 6 or December 6, 1996,
 depending on the type of residential structure.
* October Sweet's lease expires.
* December 6 The date set by the AGENCIES for the regulations to become effective
 for the type of residence owned and leased by Sheahan.
 
 
 [5]
 Part of Sweet's federal claim is that Sheahan failed to provide her with a Lead Warning Statement pursuant to 42 U.S.C. § 4852d(a)(2)-(3). See Complaint at ¶ 61. Momentarily putting aside the effective dates, Sheahan clearly had no duty to provide this Lead Warning Statement under the statute because the duty applies, by its terms, to "every contract for the purchase and sale" of target housing. 42 U.S.C. § 4852d(a)(2). The contract between Sweet and Sheahan was a contract to lease an apartment, not for sale or purchase.
 
 
 [6]
 The district court also found that allowing Sweet's suit to proceed would not be applying the regulations retroactively. The district court reasoned:
 "The regulations do not alter rights or obligations existing prior to their issuance. It is the Lead Based Paint Act which does this; the regulations merely report and explain the mandate of Congress. Thus, it is the statute and its effective date which is being applied here, not the regulations. Since the conduct at issue in this case occurred after the regulations' effective date as declared by Congress, the regulations are not being applied retroactively."
 1999 WL 1011921, at *4. For the reasons stated supra, we have already rejected the argument that the statute itself created enforceable obligations.
 
 
 [7]
 The APA does not use the term "legislative rules," and some courts, including this one, have at times discussed the distinction between interpretive and substantive rules. See, e.g., Perales v. Sullivan, 948 F.2d 1348, 1354 (2d Cir. 1991). The Seventh Circuit criticized the "interpretive/substantive" terminology as confusing in Metropolitan School District v. Davila, 969 F.2d 485, 488 (7th Cir. 1992), and we agreed with that court's conclusion and have since discussed the differences between legislative and interpretive rules. See White v. Shalala, 7 F.3d 296, 303-04 (2d Cir. 1993) (discussing with approval the Davila case).
 
 
 [8]
 It should be noted, however, that the D.C. Circuit subsequently modified this holding, at least with respect to the second criterion, publication in the Code of Federal Regulations ("C.F.R."). In Health Insurance Association of America, Inc. v. Shalala, 23 F.3d 412, 423 (D.C. Cir. 1994), the court noted the above statement in American Mining Congress, but stated that in no case had the court taken publication in the C.F.R. as "anything more than a snippet of evidence of agency intent" with regard to whether a rule has legal effect and is thus legislative. See Kenneth Culp Davis & Richard J. Pierce, Jr., 1 Administrative Law Treatise § 6.3, at 167 (1999 Supp.) (discussing modification of American Mining Congress decision).
 
 
 [9]
 We note that the proper deference afforded an interpretive rule is a matter of some debate. See Davis & Pierce, 1 Administrative Law Treatise § 6.3, at 150-51, 170-73 (discussing circuit split). We have no reason to address this question in this opinion.
 
 
 [10]
 Thus, with respect to the proposed regulations, the agencies explicitly declared:
 It appears that Congress' intent in [the statute] was to provide a year between the promulgation of the final rule, and the effective date of the rule. Congress reasonably could have believed that this year was necessary in order that the real estate industry, landlords, sellers, etc. could become familiar with the rule requirements and set up procedures for compliance.
 59 Fed. Reg. 54984-85 (1994).
 Moreover, as set forth above, when announcing the publication of the final regulations, the agencies stated:
 EPA and HUD believe that a phase in period is necessary to provide adequate time for the real estate industry, private lessors, and independent housing sellers and lessors to become familiar with the rule requirements and to set up procedures for compliance.
 61 Fed. Reg. 9064, 9068 69 (1996).