Eugene WALLACE, Elizabeth Gonsalves, Eugene Wallace as Parent and Next Friend of Melain Gonsalves, Eugene Wallace as Parent and Next Friend of Kina Gonsalves, Eugene Wallace as Parent and Next Friend of

Terris Gonsalves, Eugene Wallace as Parent and Next Friend of Lisa Gonsalves, Eugene Wallace as Parent and Next Friend of Coran Gonsalves, and Eugene Wallace as Parent and Next Friend of Jaymin Wallace, Plaintiffs,

v.

The UNITED STATES of America, The North Providence Housing Authority, and Micki Gold Realtors, Inc., d/b/a Coldwell Banker Gold, Defendants.

No. C.A.00–179S.

United States District Court, D. Rhode Island.

Sept. 9, 2004.

254

Thomas M. Dickinson, Jeffrey B. Pine, Paul S. Cantor, Providence, RI, for Plaintiffs.

Michael P. Iannotti, Providence, RI, Eric Gotting, Leland S. Van Koten, Theodore L. Hunt, Washington, DC, Daniel J. Vieira, Giannini, Craven, Vieira & DiGianfilippo, Providence, RI, Douglas C. Default, Jr., Dedham, MA, C. Russell Bengtson, Patricia A. Buckley, Carroll, Kelly & Murphy, Providence, RI, for Defendants.

### DECISION AND ORDER

SMITH, District Judge.

Plaintiffs Eugene Wallace ("Wallace"), individually and on behalf of his six minor children (the "Children"), and Elizabeth Gonsalves ("Gonsalves") (collectively "Plaintiffs") initiated this action against the United States of America, Micki Gold Realtors, Inc., d/b/a Coldwell Banker Gold ("Micki Gold"), and the North Providence Housing Authority ("NPHA") (collectively "Defendants") asserting claims for violations of the Residential Lead–Based Paint

Hazard Reduction Act of 1992 ("RLPHRA" or the "Act"), 42 U.S.C. § 4852d *et seq.*, negligence, breach of contract, and violations of R.I. Gen. Laws § 5–20.6–1 *et seq.* and R.I. Gen. Laws § 5–20.8–1 *et seq.* The Plaintiffs' principal complaint in the lawsuit is that the Defendants failed to warn them about lead-based paint in a house Wallace purchased and subsequently leased to Gonsalves and the Children. Before the Court are the Motions for Summary Judgment of NPHA and Micki Gold. For the reasons set forth below, Micki Gold's Motion for Summary Judgment is granted in part and denied in part, and NPHA's Motion for Summary Judgment is granted in part and denied in part.

## I. *Standard of Review*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant then has the burden of demonstrating the existence of a genuine issue of material fact requiring a trial. *Dow v. United Bhd. of Carpenters and Joiners of Am.,* 1 F.3d 56, 58 (1st Cir. 1993). In other words, the nonmovant is required to establish that it has sufficient evidence to enable a jury to find in its favor. *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997). However, regardless of who bears the burden, all inferences must be drawn in favor of the nonmoving party. *See The Beacon Mutual Ins. Co. v. OneBeacon Ins. Group,* 376 F.3d 8, 14 (1st Cir.2004); *Douglas v. York County,* 360 F.3d 286, 290 (1st Cir.2004).

## II. *Facts*

Wallace was a resident of Providence, Rhode Island.[1] In 1996, Wallace began a search for a house, with the intention to purchase the property and rent it to Gonsalves and their six children. The search eventually brought Wallace to a residence located at 10 Union Avenue in North Providence, Rhode Island (the "Property"), which was owned by the United States Department of Housing and Urban Development ("HUD"). Micki Gold, HUD's real estate agent[2] and representative, showed Wallace the Property prior to purchase. During the viewing of the Property, Wallace claims to have noticed paint that had "chipped" and "flaked." Although Wallace asked the Micki Gold agent questions regarding the Property, he never asked about the presence of lead paint.

Wallace eventually submitted a bid on the property of $55,000, which was accepted by HUD. On September 3, 1996, Wallace signed a purchase and sale agreement (the "Agreement") for the Property, which was a standard HUD form entitled "Property Disposition Form." The Agreement was forwarded to HUD and signed by a

---

**1.** Wallace died during the pendency of this action and Plaintiffs have not made any substitution for him as a plaintiff.

**2.** While Micki Gold acted as HUD's real estate agent for the sale to Wallace, the agency was not an exclusive HUD agent relative to the Property. Any real estate agent on HUD's approved list of agents could show a HUD property and submit bids on behalf of prospective purchasers.

representative on September 4, 1996.[3] The HUD representative signed the Agreement on the bottom-right of the document below a description entitled "Authorizing Signature & Date." The HUD representative did not, however, sign the Agreement below Wallace's signature on a line entitled "Seller." Adjacent to the "Seller" line is a box labeled "Date Contract Accepted by HUD," which also was never signed by the HUD representative.

Item number 13 of the Agreement stated that the contract "was subject to the Conditions of Sale on the reverse hereof, which are incorporated herein and made part hereof." Item K of the Conditions of Sale, on the reverse side, states the following:

> If this property was constructed prior to 1978. Seller has inspected for defective paint surfaces (defined as cracking, scaling, chipping, peeling or loose paint on all interior and exterior surfaces). Seller's inspection found no defective paint surfaces, or if defective paint surfaces were found, Seller has treated or will treat such defective surfaces in a manner prescribed by HUD prior to closing. Purchaser understands and agrees that the Seller's inspection and/or treatment is not intended to, nor does it guarantee or warrant that all lead-based paint and all potential lead-based paint hazards have been eliminated from this property. Purchaser acknowledges that he/she/it has received a copy of a notice which discusses the lead-based paint hazard and has signed, on or before the date of this contract, the addendum, Lead–Based Paint Health Hazard–Property Constructed Prior to 1978. Purchaser understands that the Addendum must be signed by all Purchasers and for-

warded to Seller with this contract. Contracts which are not in conformance with these requirements will not be accepted by Seller.

(Defendant Micki Gold's Statement of Undisputed Facts at ¶ 11.) Despite this condition, Wallace never received a copy of the Lead Paint Health Hazard Property Addendum referenced in Item K. The closing for the Property was held on September 25, 1996.

Wallace subsequently initiated renovations on the Property, which involved, among other things, removing rugs, replacing windows and defective radiators, installing new ceilings, as well as sanding and stripping the wood inside the house. Wallace also hired painters to paint the exterior of the home. In late November 1996, Gonsalves leased the Property from Wallace, and moved into the Property with the Children. After Gonsalves and the Children had moved into the Property, Wallace continued making renovations with the assistance of Gonsalves.

Gonsalves leased the Property with the intention of obtaining assistance from the NPHA through its Section 8 housing subsidy program. Before Gonsalves signed the lease, the NPHA inspected the Property and completed a detailed inspection checklist, which considered the presence of lead paint. The NPHA determined that the Property "passed" the inspection with respect to all rooms in the house. A second home inspection was conducted by the NPHA on or about October 20, 1997, which also did not detect the presence of lead-based paint on the Property.

Within months after moving into the Property, the Children were found to have elevated levels of lead in their blood. Sub-

---

**3.** HUD signed the Agreement one day after Wallace due to his failure to check the "Investor box" located at item number 8 of the Agreement. On September 4, 1996, HUD was able to verify Wallace's interest in the Property (*i.e.,* as an investment and/or principal residence) and join in signing the Agreement.

sequent testing of the house revealed the presence of lead paint throughout the Property. On April 6, 2000, the Plaintiffs initiated this action against the United States, Micki Gold, and the NPHA asserting negligence, breach of contract, and violations of the RLPHRA, R.I. Gen. Laws §§ 5–20.6–1 *et seq.* and 5–20.8–1. By Order of the Court, on September 8, 2000, the Plaintiffs amended their Complaint to comply with Fed.R.Civ.P. Rule 8(c) and (e).

Judge Mary M. Lisi, of this Court, previously dismissed the tort claims contained in Counts I and III of the Amended Complaint because Wallace and Gonsalves failed to file administrative claims as required by the Federal Tort Claims Act, 28 U.S.C. § 2675(a). *See* Memorandum and Decision of August 28, 2000, at 2. Additionally, the Court dismissed Wallace's breach of contract claim (asserted in Count I) because the Tucker Act, 28 U.S.C. § 1491, vests exclusive jurisdiction over breach of contract claims in the United States Court of Federal Claims. *Id.* In late 2002 this case was transferred to the undersigned. On January 8, 2004, the Court dismissed Count V of the Amended Complaint, which was asserted against the United States, because it is barred by the misrepresentation exception of the Federal Tort Claims Act, 28 U.S.C. § 2675(a). *Wallace v. United States,* C.A. 00–179S, 2004 WL 63503, at *3 (D.R.I. Jan.8, 2004). As a result, the following claims remain pending in this action: (1) common law negligence and breach of 42 U.S.C. § 4852d brought by Wallace against Micki Gold (Count II); (2) common law negligence and breach of 42 U.S.C. § 4852d brought by Gonsalves against Micki Gold (Count IV); (3) common law negligence and breach of 42 U.S.C. § 4852d brought by Wallace, as next friend of the Children, against Micki

Gold (Count VI); (4) common law negligence brought by Wallace, as next friend of the Children, against NPHA (Count VII); (5) common law negligence brought by Wallace against NPHA (Count VIII); (6) common law negligence brought by Gonsalves against NPHA (Count IX); and (7) breach of R.I. Gen. Laws § 5–20.6–1 *et seq.,* brought by Wallace against Micki Gold (Count X).[4]

The Defendants' Motions for Summary Judgment attack each of the remaining counts on multiple grounds.

### III. *Analysis*

#### A. Breach of the RLPHRA, 42 U.S.C. § 4852d (Counts II, IV and VI)

In Counts II, IV, and VI of the Amended Complaint, Wallace, individually and as guardian of the Children, and Gonsalves allege that Micki Gold violated federal law by failing to comply with the RLPHRA when it acted as HUD's agent in the sale of the Property. The objective of the RLPHRA is the development of "a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. § 4851(a). To further this objective, the RLPHRA directs the Secretary of HUD, as well as the Administrator of the Environmental Protection Agency (the "EPA"), to promulgate regulations that mandate disclosure of lead-based paint hazards in privately owned housing that is either sold or leased. *See* 42 U.S.C. § 4852d. The RLPHRA provides, in pertinent part, that

[t]he regulations shall require that, before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall—

---

**4.** Counts II, IV, and VI also allege violations of R.I. Gen. Laws § 5–20.8–1 *et seq.* For organizational purposes, these claims will be

addressed along with the allegations pertaining to violations of R.I. Gen. Laws § 5–20.6–1 *et seq.*

(A) provide the purchaser or lessee with a lead hazard information pamphlet, as prescribed by ... 15 U.S.C. § 2686;

(B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor; and

(C) permit the purchaser a 10–day period (unless the parties mutually agree upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

42 U.S.C. § 4852d(a)(1). The Act also requires that every contract for the purchase and sale of any interest in "target housing"[5] must contain a warning statement and further provides the exact content of the statement. See 42 U.S.C. § 4852d(a)(2)-(3). The statute provides that "[a]ny person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by each individual." 42 U.S.C. § 4852(b)(3).

The RLPHRA directed HUD and the EPA to promulgate the relevant regulations "[n]ot later than 2 years after October 28, 1992." 42 U.S.C. § 4852d(a)(1).

The effective date for the regulations was three years after October 28, 1992, or, October 28, 1995. See 42 U.S.C. § 4852d(d). For reasons never fully explained,[6] the EPA and HUD did not promulgate the regulations and make them effective until September 6, 1996, or December 6, 1996, depending on the number of dwellings owned by the seller or lessor.[7] Requirements for Disclosure of Known Lead–Based Paint and/or Lead–Based Paint Hazards in Housing, 61 Fed.Reg. 9064, 9065 (Mar. 6, 1996). In this case, because HUD owned more than four residential dwellings in 1996, the operative effective date of the regulations was September 6, 1996.

In its Motion for Summary Judgment, Micki Gold contends that, as a matter of law, it cannot be held liable under the RLPHRA for two reasons: (1) it was not bound by the Act's disclosure obligations because the parties entered into the Agreement to purchase the Property prior to the effective date of the regulations; and (2) Gonsalves and the Children have no standing to sue it for violations of the Act because its obligations run from seller to buyer, or from lessor to lessee, not from seller to eventual lessee.

Micki Gold contends that since the parties entered into the Agreement to purchase the Property on September 3, 1996 (three days prior to the effective date of

---

5. "Target housing" refers to "housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing for the elderly or persons with disabilities) or any 0–bedroom dwelling." 42 U.S.C. § 4851b(27).

6. On November 2, 1994, five days after the Act required that the regulations be promulgated, the EPA and HUD published proposed regulations. Proposed Requirements for Disclosure of Information Concerning Lead–Based Paint in Housing, 59 Fed.Reg. 54,984

(Nov. 2, 1994). These proposed regulations indicated, despite the requirements of the Act, that the October 28, 1995 deadline could not be met. Id. at 54,984–85. For a more detailed explanation of the delay in promulgating the regulations, the Court directs the interested to the helpful explanation in Sweet v. Sheahan, 235 F.3d 80, 84–85 (2d Cir.2000).

7. For owners of more than four residential dwellings, the effective date of the regulations was September 6, 1996; however, in the case of owners of one to four residential dwellings, the effective date was December 6, 1996.

the regulations), the regulations did not apply to the transaction despite the enactment of the RLPHRA several years earlier. Micki Gold relies on the reasoning of *Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000), and *Sipes v. Russell*, 89 F.Supp.2d 1199 (D.Kan.2000). *Sweet* is directly on point. In *Sweet*, a tenant sued her landlord, on behalf of herself and her minor son, claiming that the landlord failed to provide her with warnings about lead-based paint in her apartment in violation of the RLPHRA. The defendant moved to dismiss, contending that the regulations creating the duty to warn her about lead-based paint hazards were not in effect at the time that plaintiff leased the property. The district court denied the motion, holding that the duty arose on the date the statute mandated for the regulations to take effect. On appeal, the Second Circuit reversed the district court, holding that the landlord's duty of disclosure under the RLPHRA is governed by the date the regulations actually went into effect (December 6, 1996), not the date the statute mandated that the regulations take effect (October 28, 1995). The court reasoned that the statute imposed no actual obligations on private parties, only on the administrative agencies. Until those agencies promulgated their respective regulations, private parties had no obligations with which to comply. *Sweet*, 235 F.3d at 87. The court also relied on the established principle of law that "proposed regulations, in this case those issued on November 2, 1994, have no legal effect." *Id.* (collecting cases); *see also Sipes*, 89 F.Supp.2d at 1203–04 (dismissing an action brought under the RLPHRA on the grounds that the regulations were not in effect when the plaintiff leased the property).

■ The facts of this case, however, are different from *Sweet* and *Sipes* in one critical respect. In those cases, it was undisputed that the parties had entered into their respective contracts to purchase property prior to the promulgation of the RLPHRA regulations. Here, on the other hand, while it is undisputed that Wallace signed the Agreement to purchase the Property three days prior to the effective date of the regulations, it is unclear whether HUD assented to the Agreement prior to September 6, 1996. A HUD representative signed the Agreement prior to the promulgation of the regulations, but the space on the Agreement that appears to be reserved for a HUD representative's signature approving the purchase was never signed. (Ex. 1, Def. Micki Gold's Statement of Undisputed Facts.) It is entirely possible that the HUD representative's signature at the bottom of the Agreement was HUD's acceptance of the contract, but for this Court to make such a finding, in light of HUD's failure to sign the other line of the Agreement, would be to draw an inference in favor of the nonmovant. As the First Circuit has made clear on numerous occasions, a district court is not permitted to draw such inferences when ruling on a motion for summary judgment.

■ Micki Gold's other ground for summary judgment on Gonsalves's and the Children's RLPHRA claims—that they lack standing to sue under the Act—is much stronger. Micki Gold contends that, even if the regulations were in effect at the time the parties entered into a contract for the sale of the Property, it is entitled to summary judgment because the RLPHRA does not create any obligations between Micki Gold and Gonsalves or the Children. Specifically, Micki Gold argues that the Act does not obligate sellers of property, or their agents, to provide any disclosures to third parties, such as Gonsalves and the Children, who may ultimately lease the property. The RLPHRA provides that "[t]he regulations shall require that, before the purchaser or lessee is obligated under

any contract to purchase or lease the housing, the *seller or lessor* shall ... provide the *purchaser or lessee* with a lead hazard information pamphlet." 42 U.S.C. § 4852d(a)(1) (emphasis added). The regulations provide a similar obligation: "a *seller or lessor* of target housing shall disclose to the *purchaser or lessee* the presence of any known lead-based paint and/or lead-based paint hazards...." 40 C.F.R. § 745.100 (emphasis added). Neither the statute nor the regulations indicate whether sellers or lessors must comply with the disclosure obligations with respect to parties unconnected to the real estate transaction with which they were involved. For the reasons that follow, this Court finds that the regulations do not impose a duty running from the realtor to the eventual lessee. Rather, the duty to disclose runs from the seller to a purchaser and/or from a lessor to a lessee only.

The purpose of the RLPHRA is to provide for the disclosure of lead-based paint hazards by "impos[ing] certain requirements *on the sale or lease* of target housing." *Id.* By drafting the RLPHRA and its implementing regulations in this manner, Congress and HUD chose to focus on the eradication of lead-based paint in the nation's housing stock by creating disclosure obligations that would be triggered at the time of sale or lease. The language of the statute and regulations imply strongly that the obligations created thereunder run from a seller to a purchaser, or from a lessor to a lessee. Consistent with this view, in *Gladysz v. Desmarais,* No. Civ. 02–208–B, 2003 WL 1343033, at *2 (D.N.H. Mar.17, 2003), an unpublished decision,[8] Chief Judge Barbadoro interpreted the RLPHRA and held that children living in a home contaminated with lead-based paint, but who were not lessees of the property, could not bring suit under the

RLPHRA because they were not purchasers or lessees under the Act.

In this case, neither Gonsalves nor the Children purchased or leased the Property from HUD—the transaction in which Micki Gold served as real estate agent. While Gonsalves, as lessee of the Property from Wallace, may have a cause of action against Wallace, she has no cause of action against Micki Gold under the Act. Accordingly, Micki Gold's Motion for Summary Judgment as to Gonsalves's and the Children's claims under 42 U.S.C. § 4852d(b)(3) is granted. Micki Gold's Motion for Summary Judgment as to Wallace's claim under 42 U.S.C. § 4852d(b)(3), however, is denied.

## B. *Negligence*

In the common law negligence claims asserted in Counts II, IV, and VI, the Plaintiffs allege that Micki Gold, acting as HUD's real estate broker in the sale of the Property to Wallace, failed to provide warnings regarding the possible presence of lead-based paint and its attendant health risks. In Counts VII, VIII, and IX, the Plaintiffs allege that NPHA was negligent: (1) in the manner it conducted inspections of the Property because it failed to detect the presence of lead hazards; and (2) in its written inspection report, which failed to advise them of the possibility of lead hazards. NPHA and Micki Gold challenge the Plaintiffs' negligence counts on several grounds.

### 1. *NPHA's Grounds for Summary Judgment*

■ First, NPHA alleges that it is entitled to summary judgment on Wallace's and Gonsalves's individual claims for negligence because "neither of the Plaintiffs

---

**8.** Although *Gladysz* is an unpublished decision, the Court nonetheless finds its interpretation and analysis of the RLPHRA persuasive.

has presented any competent evidence of personal injuries at all, never mind injuries associated with lead based paint exposure." (NPHA's Mem. Supp. Motion for Sum. Judg. at 5.) This Court agrees. In order to find negligence against NPHA for their inspections, Wallace and Gonsalves must be able to prove "that there was actual loss or damage resulting [from the alleged negligence]." *Splendorio v. Bilray Demolition Co., Inc.*, 682 A.2d 461, 466 (R.I.1996) (citing *Jenard v. Halpin*, 567 A.2d 368, 370 (R.I.1989)). Gonsalves testified at her deposition that she received no medical treatment for lead poisoning:

Q. Have you yourself received any medical attention for lead exposure?

A. Me myself? No.

Q. Have you had any treatment for lead exposure?

A. No.

(NPHA Ex. B, Gonsalves Dep. at 325–26.) Wallace also failed to identify any medical problems relating to his exposure to lead paint. (NPHA Ex. B, Wallace Dep. at 151–52.) Because Gonsalves and Wallace have failed to establish any damages resulting from their exposure to lead-based paint, the negligence claims asserted against NPHA in Counts VIII and IX fail as a matter of law.

With respect to Gonsalves's negligence claim on behalf of the Children, NPHA argues that it is entitled to summary judgment as to Melain Gonsalves, Lisa Gonsalves, and Jaymin Wallace because the Plaintiffs' expert cannot state to a reasonable degree of medical certainty that their exposure to lead-based paint caused their alleged behavioral and cognitive problems. During his deposition, the Plaintiffs' expert, James G. Linakis, M.D., testified that he was unable to state to a reasonable degree of medical certainty that these three children have any difficulties that can be attributed to their lead exposure. (Dep. Linakis, Def. Ex. D at 82, 88–89.)

In response, the Plaintiffs argue that there is overwhelming evidence that the Children suffered lead poisoning and were forced to undergo treatment for the elevated levels of lead in their blood. Accordingly, the Plaintiffs contend that NPHA's Motion for Summary Judgment should more properly be characterized as one for partial summary judgment because they are at least entitled to attempt to recover damages for the lead poisoning and its attendant treatment even if the behavioral and cognitive problems cannot be linked to the lead poisoning. This Court agrees. It is undisputed that the Children suffered lead poisoning after moving into the Property, and as a result of the lead poisoning, the Children had to undergo treatment for the exposure. Dr. Linakis's expert report unequivocally states that all of the Children, including Melain Gonsalves, Lisa Gonsalves, and Jaymin Wallace, suffered from elevated levels of lead in their blood at a time period *after* moving into the Property. (Expert Rep. of Dr. Linakis, Mem. in Support of NPHA's Motion for Summary Judgment, at Ex. C.) Dr. Linakis also stated that this conclusion was drawn after reviewing the Children's medical records obtained from their primary care physician, emergency medical department records, lead clinic records, and laboratory records from the Rhode Island Department of Health Laboratories, among others. (*Id.*) Therefore, NPHA's Motion for Summary Judgment on the ground that Melain Gonsalves, Lisa Gonsalves, and Jaymin Wallace have not suffered any harm as a result of their exposure to lead is denied. However, NPHA's Motion for Summary Judgment is granted with respect to the claims of Melain Gonsalves, Lisa Gonsalves, and Jaymin Wallace for damages relating to their behavioral and cognitive problems.

■ NPHA also argues that it is entitled to summary judgment on the negligence claims brought on behalf of Kina Gonsalves, Terris Gonsalves, and Coran Gonsalves because Dr. Linakis is unable to state that lead poisoning was the proximate cause of their alleged behavioral and cognitive disabilities. In Rhode Island, "one resisting summary judgment must assert 'sufficient facts to satisfy the necessary elements of his [or her] negligence claim' and if a 'plaintiff fails to present evidence identifying defendants' negligence as the proximate cause of his [or her] injury or from which a reasonable inference of proximate cause may be drawn,' then summary judgment becomes proper." *Splendorio,* 682 A.2d at 467 (quoting *Russian v. Life–Cap Tire Servs., Inc.,* 608 A.2d 1145, 1147 (R.I.1992)). "[P]roximate cause is established by showing that but for the negligence of the tortfeasor, injury to the plaintiff would not have occurred." *English v. Green,* 787 A.2d 1146, 1151 (R.I.2001) (quoting *Skaling v. Aetna Ins. Co.,* 742 A.2d 282, 288 (R.I.1999)).

■ NPHA's challenge focuses on whether Dr. Linakis's deposition testimony is sufficient to support the requisite "but-for" connection. In the context of proximate cause, the Rhode Island Supreme Court has stated that "[e]xpert testimony, if it is to have any evidentiary value, must state with some degree of certainty that a given state of affairs is the result of a given cause." *Gray v. Stillman White Co., Inc.,* 522 A.2d 737, 741 (R.I.1987) (quoting *Parrillo v. F.W. Woolworth Co.,* 518 A.2d 354, 355–56 (R.I.1986)). Moreover, "[i]t is well settled in [Rhode Island] that when expert medical testimony is offered to establish a causal relationship between a defendant's act or omission and the plaintiff's

injury, 'such testimony must speak in terms of 'probabilities' rather than 'possibilities.'' " *Id.* (quoting *Parrillo,* 518 A.2d at 355); *see also Sweet v. Hemingway Transport, Inc.,* 114 R.I. 348, 333 A.2d 411 (1975).

■ In his summary of the Children's medical records, Dr. Linakis indicates with respect to Kina, Terris, and Coran that "there is a high degree of probability that lead poisoning was a major contributing factor to [the children]'s attention and behavioral problems." (Def. Ex. C at 4–7.) Dr. Linakis made similar statements at his deposition. (Def. Ex. D at 86–87.) NPHA argues that Dr. Linakis's use of the phrase "major contributing factor" to describe the causal relationship between Kina, Terris, and Coran's lead exposure and their alleged problems is insufficient under Rhode Island law to establish proximate cause. This Court disagrees. Dr. Linakis's statement that the lead exposure was a "major contributing factor" was not equivocal in nature. While lead exposure may not have been the sole cause of Kina, Terris, and Coran's problems, Dr. Linakis's testimony states with a "degree of positiveness," *Sweet,* 333 A.2d at 415, that lead exposure was a contributing cause of their problems. The weight of this testimony must be left to the fact-finder. Accordingly, NPHA's Motion for Summary Judgment on the ground that Plaintiffs cannot prove proximate cause with respect to the harm allegedly suffered by Kina, Terris, and Coran is denied.[9]

■ Finally, NPHA argues that the Plaintiffs' negligence claims must be dismissed because their deposition testimony indicates that they did not rely on the home inspections when deciding to per-

---

9. Micki Gold also challenged the ability of the Plaintiffs to prove proximate causation with respect to Kina, Terris, and Coran's behavior-al and cognitive problems. This basis for summary judgment is rejected for the same reasons.

form renovations at the Property. NPHA therefore contends that its conduct could not have been the proximate cause of the Plaintiffs' injuries. In her deposition, Gonsalves stated that (based on previous experiences with the leasing of subsidized housing) she would not have changed the manner in which she renovated the Property if she had received a lead disclosure pamphlet prior to moving into the Property:

Q: And the pamphlet, as it stands now, had you read it before 1996 you wouldn't have done anything differently about the renovations, is that a fair statement?

A: I wouldn't have done nothing differently. [The pamphlet] was the same. Because there's nothing, what can I say?

(NPHA Ex. B, Gonsalves Dep. at 380.) However, the Plaintiffs allege not only that they were never warned of the possible presence of lead paint, but also that the inspections of the Property were performed negligently. Accordingly, NPHA's logic seems to flow as follows: Plaintiffs renovated the Property without relying on the inspections, and therefore, even if the inspections had discovered the presence of lead paint the Plaintiffs would have continued to renovate the Property despite the health risks. This argument requires the Court to assume, however, that the Plaintiffs would have assumed the risk of the lead paint hazard had they known of its actual presence, as opposed to merely the possibility of its presence. Courts are rarely permitted to make such assumptions—especially when ruling on a motion for summary judgment. Again, this is a question best reserved for the jury; therefore this ground for summary judgment must be rejected.

### 2. *Micki Gold's Grounds for Summary Judgment*

In addition to the grounds discussed previously, Micki Gold argues that summary judgment must be granted in its favor on the state law negligence claims because it owed the Plaintiffs no legal duty.

#### a. *Wallace*

 Micki Gold contends that it owed Wallace no duty to disclose the possibility of lead paint. This Court disagrees. This Court has held there are genuine issues of material fact with respect to whether the disclosure requirements of the RLPHRA were in effect at the time Wallace purchased the Property. If the regulations were in effect at that time, the RLPHRA would be sufficient to establish a standard of care owed to Wallace. Moreover, while R.I. Gen. Laws § 5–20.8–1 *et seq.* provides no private right of action, it may establish a standard of care resulting in negligence liability if it is breached. *Stebbins v. Wells*, 818 A.2d 711, 721 (R.I.2003)("Nevertheless, ... any violations of [R.I. Gen. Laws § 5–20.8–1] by the seller can be cited as breaches of the seller's legal duty to disclose in support of any negligence claims against the seller."). Therefore, Micki Gold's Motion for Summary Judgment with respect to Wallace's negligence claim, on the ground that there was no duty to disclose the possible presence of lead paint, is denied.

#### b. *Gonsalves and the Children*

Micki Gold also contends that it is entitled to summary judgment on the negligence claims of Gonsalves and the Children because it owed them no legally cognizable duty. Micki Gold points to the following facts in support of this contention: Gonsalves and the Children had no involvement in the purchase of the Prop-

erty, and never met the Micki Gold representative prior to the purchase of the Property; Gonsalves and the Children had no contact with the representative until months after the purchase was completed; and Gonsalves and the Children did not move into the Property until months after the purchase, when they became Wallace's tenants.

▆▆▆▆ It is hornbook law that an action in negligence may only be maintained when the plaintiff shows that the defendant breached a duty of care owed to the plaintiff. *Moseley v. Fitzgerald*, 773 A.2d 254, 258 (R.I.2001). Plaintiffs argue that the statutes relied on in their Amended Complaint (42 U.S.C. § 4852d, R.I. Gen. Laws § 5–20.8–1, and R.I. Gen. Laws § 23–24.6–1) are sufficient evidence of the existence of a duty running from Micki Gold to Gonsalves and the Children. Rhode Island courts have long recognized the admission of violations of a statute as evidence of negligence. *Clements v. Tashjoin*, 92 R.I. 308, 168 A.2d 472, 474 (1961); *Sitko v. Jastrzebski*, 68 R.I. 207, 27 A.2d 178, 179 (1942) ("Although the violation of the statute . . . may not itself be a ground of action, yet if the violation of the duty imposed for the safety of the public is the cause of the injury evidence of the violation is prima facie evidence of negligence.") (quoting *Oates v. Union R.R. Co.*, 27 R.I. 499, 63 A. 675, 677 (1906)).[10] To rely on such a theory, a plaintiff must demonstrate that he or she "is a person whom the statute was designed to protect . . . and that the harm that occurred was the kind of harm the statute was designed to prevent." *Bandoni v. State*, 715 A.2d

580, 628 (R.I.1998) (citing Restatement (Second) of Torts § 286, at 25 (1965)). "[I]f the injured person falls outside of the protective orbit of the statute, his claim based on breach of a statutory duty of care will not be presented to the jury for no such duty was owed to him." *Id.* (quoting *Paquin v. Tillinghast*, 517 A.2d 246, 248 (R.I.1986)). Justice Flanders has noted that "[t]he common thread in these cases is that [the Supreme Court of Rhode Island] has found a duty running from a defendant to an intended beneficiary plaintiff vis-a-vis a statute." *Id.* at 629.

As an initial matter, there is little doubt that the harm suffered in this case is of the type contemplated by the statutes. *See* R.I. Gen. Laws § 5–20.8–2(2) (xxxi) ("Every buyer of residential real estate built prior to 1978 is hereby notified that those properties may have lead exposures that may place young children at risk of developing lead poisoning."); R.I. Gen. Laws § 23–24.6–2 (stating, as legislative findings, that "[e]nvironmental exposures to even low levels of lead increase a child's risks of developing permanent learning disabilities, reduced concentration and attentiveness and behavior problems . . . .").

The more difficult question is whether Gonsalves and the Children fall within the "protective orbit" of the statutes. In support of their contention that the Children fall within the protective orbit of the statutes, the Plaintiffs rely primarily on two cases: *Errico v. LaMountain*, 713 A.2d 791 (R.I.1998) and *Paquin v. Tillinghast*, 517 A.2d 246 (R.I.1986). Their reliance on both cases is misplaced. In *Paquin*, the defendant's car, after failing to stop for a

---

**10.** Use of a violation of a statute as evidence of negligence is different from negligence *per se.* Under the principles set forth in *Clements* and *Sitko*, a plaintiff must still prove that the violation was the direct and proximate cause of the injury "and not merely a condition or circumstance which furnished the occasion therefor." *Clements*, 168 A.2d at 475; *see*

*Bandoni v. State*, 715 A.2d 580, 628 (R.I.1998) (Flanders, J. dissenting) ("Unlike some other states, in Rhode Island the violation of a statute is not conclusive evidence of negligence, nor does it create a presumption of a violation of a duty of care or relieve a jury of finding a breach of such a duty.").

school bus, collided with the plaintiff's car in a nearby intersection. The plaintiff sued the defendant for negligence. In an effort to establish evidence of negligence, the plaintiff attempted to rely on the defendant's failure to comply with R.I. Gen. Laws § 31–20–12, which requires drivers to stop their vehicles when they approach a stopped school bus displaying flashing red lights. The trial court refused to give the jury an instruction on this issue. On appeal, the Rhode Island Supreme Court looked to the intent of the legislature to determine whether the plaintiff was within the protective orbit of § 31–20–12. The court found that the statute was designed to protect schoolchildren that were entering and exiting a flashing school bus. The court held that while the defendant may have violated the statute and caused harm to the plaintiff, the statute was not designed to protect the plaintiff—it was designed to protect schoolchildren. "[T]he jury may be instructed that a violation of § 31–20–12 may be considered as evidence that a duty owed to schoolchildren was breached, but not that a duty to another motorist located down the road was breached." 517 A.2d at 248. The court therefore upheld the trial court's decision not to allow the plaintiff to use a breach of the statute as evidence of negligence.

The Plaintiffs argue that this case is factually different from *Paquin*, and that when the reasoning of *Paquin* is applied to the facts of this case, Gonsalves and the Children fall within the protective orbit of the statutes at issue here. Specifically, the Plaintiffs contend that the Rhode Island statutes that were allegedly violated in this case clearly were designed to protect people such as Gonsalves and the Children, and therefore violations of those statutes should be admissible as evidence

of Micki Gold's negligence, unlike the result in *Paquin*. The Plaintiffs believe "[t]here can be no doubt that [§ 5–20.8–2(b)(xxxi)] was enacted for the protection of children who would foreseeably reside in the home and potentially be at risk from the presence of lead-based paint." (Pl. Mem. in Opp. at 18–19.) However, this statement is only partly correct because "[s]tatutes *in pari materia* are to be considered harmoniously by this [C]ourt." *Paquin*, 517 A.2d at 248. Section 5–20.8–2(b)(xxxi), as well as the other statutes relied on by the Plaintiffs, are clearly designed to protect children from the harms of lead paint, but they only apply in the context of real estate transactions. Therefore the Court must read the child protection aspects of the statutes in light of the fact that the lead disclosure obligations arise only during such transactions. The statutes require sellers to give notice of the possibility of lead paint to all potential buyers, and landlords must also provide the same disclosures to tenants. Under the Plaintiffs' reading of *Paquin*, sellers (or agents such as Micki Gold) must not only give notice to buyers, but also to unknown tenants to whom the buyers may lease the property. This would result in the imposition of a never-ending chain of potential liability for sellers of property and the Court refuses to endorse such a position. This Court's holding is supported by *Errico*. In *Errico*, the Rhode Island Supreme Court permitted a violation of Rhode Island's Landlord Tenant Act to be admissible as evidence of negligence, even though the act itself provided the plaintiff no private right of action. However, in that case the plaintiff was the tenant of the defendant and therefore the act was clearly designed to protect the plaintiff as the tenant of the defendant.[11]

11. In *Santucci v. Citizens Bank of Rhode Island*, 799 A.2d 254, 257 (R.I.2002) (per curiam), the Rhode Island Supreme Court stressed this interpretation of its holding in *Errico*.

Therefore, because Micki Gold did not owe Gonsalves and the Children a duty, Micki Gold's Motion for Summary Judgment as to the negligence claims asserted in Counts IV and V is granted.[12]

### C. Violations of R.I. Gen. Laws § 5–20.6–6 and R.I. Gen. Laws § 5–20.8–5

In Counts II, IV, and VI, the Plaintiffs allege that Micki Gold violated R.I. Gen. Laws § 5–20.8–5, which requires a seller of real estate to provide a potential buyer with a disclosure of material defects of the property. In Count X of the Amended Complaint, Wallace asserts that Micki Gold violated R.I. Gen. Laws § 5–20.6–6 by failing to provide him with a form entitled "Disclosure Regarding Real Estate Agency Relationship." The purpose of the form is to confirm, in writing, that a real estate agent has advised the potential buyer that the agent represents the interests of the seller, and not the buyer.

 As its basis for summary judgment, Micki Gold argues that R.I. Gen. Laws § 5–20.8–5 does not afford the Plaintiffs a private right of action. Furthermore, with respect to Count X, Micki Gold argues that, while R.I. Gen. Laws § 5–20.5–14(b) authorized the Director of Business Regulation to impose a penalty upon agents who fail to comply with the disclosure requirement imposed by R.I. Gen. Laws § 5–20.6–6, the statute does not give aggrieved buyers a private right of action against an agent.

Although the Rhode Island Supreme Court has never addressed this issue with respect to § 5–20.6–6, it recently addressed the existence of a private right of action for violations of § 5–20.8–5 in *Stebbins v. Wells*, 818 A.2d 711 (R.I.2003) (per curiam). There, an aggrieved buyer of real estate sued the seller of the property and the seller's agent for failing to disclose an alleged material defect concerning the condition of the property. The buyer also sued the seller's agent for failing to provide him with a disclosure statement as required by R.I. Gen. Laws § 5–20.8–2. The act did not specifically provide for a private right of action, but it did provide for civil penalties of $100 per occurrence for failing to comply with the act's disclosure provision. The Rhode Island Supreme Court held that when the General Assembly prescribes a particular civil enforcement mechanism such as civil fines, but chooses not to provide for a private right of action, one cannot be inferred. *Id.* at 715. While *Stebbins* only dealt with the disclosure requirement of § 5–20.8–2, this Court finds that the Rhode Island Supreme Court's reasoning applies with equal force to the disclosure requirements of § 5–20.6–6. Therefore, Micki Gold's Motion for Summary Judgment as to the claims for violation of R.I. Gen. Laws § 5–20.8–2 asserted in Counts II, IV, and VI, as well as to the claim for violation of R.I. Gen. Laws § 5–20.6–6 asserted in Count X of the Amended Complaint, is granted.

### IV. Conclusion

For the foregoing reasons, the Court ORDERS as follows with respect to *Micki Gold's Motion for Summary Judgment:*

---

**12.** This result may appear harsh, but this is an unusual case. Wallace, as the buyer of the Property, has a cause of action against Micki Gold and could use the alleged violations of the aforementioned statutes as evidence of negligence. However, Wallace, as the landlord of Gonsalves and the Children, had an obligation to produce the same materials to them that he claims never to have received from Micki Gold. As his tenants, Gonsalves and the Children could have brought a cause of action against Wallace, but chose not to do so—presumably because of his common law husband relationship with Gonsalves, and the fact that he is the father of the Children.

(1) Micki Gold's Motion for Summary Judgment as to Wallace's claim under 42 U.S.C. § 4852d, as well as his negligence claim, that are asserted in Count II is DENIED. Micki Gold's Motion for Summary Judgment as to Wallace's claim for a violation of R.I. Gen. Laws § 5–20.8–1 asserted in Count II is GRANTED;

(2) Micki Gold's Motion for Summary Judgment as to all of Gonsalves' claims asserted in Count IV is GRANTED;

(3) Micki Gold's Motion for Summary Judgment as to all of the Children's claims asserted in Count VI is GRANTED; and

(4) Micki Gold's Motion for Summary Judgment as to the claim for breach of R.I. Gen. Laws § 5–20.6–1 asserted in Count X is GRANTED.

For the foregoing reasons, the Court ORDERS as follows with respect to *NPHA's Motion for Summary Judgment:*

(1) NPHA's Motion for Summary Judgment as to the Children's negligence claims is GRANTED in part, and DENIED in part. The Motion is granted to the extent it attempts to prevent Melain Gonsalves's, Lisa Gonsalves's, and Jaymin Wallace's claims for damages due to their behavioral and cognitive problems, but not for damages due to other harm. The Motion is denied to the extent that it attempts to prevent Kina Gonsalves's, Terris Gonsalves's, and Coran Gonsalves's claims for damages due to their behavioral and cognitive problems;

(2) NPHA's Motion for Summary Judgment as to Wallace's negligence claim asserted in Count VIII is GRANTED; and

(3) NPHA's Motion for Summary Judgment as to Gonsalves's negligence claim asserted in Count IX is GRANTED.

The following issues therefore remain for trial:

(1) Count II: Wallace's claims against Micki Gold for negligence and violation of 42 U.S.C. § 4852d; and

(2) Count VII: Wallace/Gonsalves's claim brought on behalf of the Children for negligence against the North Providence Housing Authority.

IT IS SO ORDERED.