[928 NYS2d 740]

Amaiya A. Brown et al., Respondents, v Maple3, LLC, Appellant.

Second Department, August 23, 2011

**APPEARANCES OF COUNSEL**

*Landman Corsi Ballaine & Ford P.C.* and *Shaub, Ahmuty, Citrin & Spratt, LLP*, Lake Success (*Steven J. Ahmuty, Jr., Timothy R. Capowski* and *Deirdre E. Tracey* of counsel), for appellant.

*Fitzgerald & Fitzgerald, P.C.*, Yonkers (*John E. Fitzgerald, John M. Daly, Eugene S. R. Pagano, Delsia G. Marshall* and *Aileen Gutierrez-Glennon* of counsel), for respondents.

ROMAN, J.

## Introduction

The infant Amaiya A. Brown, on whose behalf her mother, Alexandra Fildere-Brown, commenced this action, allegedly sustained injuries as a result of exposure to lead paint in a building owned by the defendant, Maple3, LLC (hereinafter the landlord). Among the primary issues we consider on this appeal is whether a lessee's adult daughter and infant grandchild have standing to assert a cause of action under the Residential Lead-Based Paint Hazard Reduction Act of 1992 (42 USC § 4851 *et seq.* [hereinafter the RLPHRA]) for injuries allegedly sustained as a result of a landlord's alleged failure to disclose the presence of known lead-based paint hazards. We conclude that the plaintiffs lack standing to maintain a cause of action under the RLPHRA. Additionally, as will also be discussed, we find that the landlord's conduct in this case was not so egregious as to support a claim for punitive damages. Accordingly, the Supreme Court should have granted those branches of the landlord's motion which were for summary judgment dismissing the cause of action alleging a violation of the RLPHRA and the claim for punitive damages.

## Factual and Procedural Background

In 1993 or 1994, Bonne Annee St. Anne (hereinafter the grandmother) rented an apartment in a residential building owned by the landlord, pursuant to a lease which was renewable every two years. At that time, the grandmother's daughter, Alexandra Fildere-Brown, was 12 years old and resided in the apartment with the grandmother. In 2003, Alexandra, who was still residing in the apartment, gave birth to Amaiya A. Brown.

Alexandra testified at her deposition that the landlord painted and performed repairs inside the apartment on several occasions prior to the birth of her daughter, sometimes in response to verbal complaints about the condition of the paint in the apartment. The grandmother testified that there was peeling paint in a "bunch of places" in the apartment and that she complained about the condition every day to the superintendent.

In September 2004, when Amaiya was about one year old, she was tested and found to have a blood-lead level of less than three micrograms per deciliter. In November 2005, Amaiya's

blood-lead level rose to 20 micrograms per deciliter. The following month, the New York City Department of Health (hereinafter the Department of Health) inspected the apartment and found elevated levels of lead on several painted surfaces. As a result, on December 29, 2005, the Department of Health issued an order directing the landlord to abate all lead paint violations and to complete all abatement work within five days. Alexandra and the grandmother identified the landlord's renovation of the bathroom as the potential source of Amaiya's exposure to lead. Alexandra testified at her deposition that when the landlord renovated the bathroom, there were "particles . . . everywhere" and that Amaiya had put some "white stuff" in her mouth.

On January 5, 2006, the Department of Health issued an inspection report indicating that all violations remained. By February 7, 2006, Amaiya's blood-lead level had decreased to 14 micrograms per deciliter. Additional inspection reports dated February 7, 2006, February 16, 2006, and February 24, 2006 indicated that partial violations remained. The Department of Health issued an inspection report dated March 3, 2006, stating that a radiator and exterior door opening had not been properly abated, as there was visible evidence of old paint beneath a new layer. A subsequent inspection report dated March 9, 2006 provided that only one violation remained. The Department of Health issued a final inspection report on March 20, 2006, indicating that all violations had been cured. By May 22, 2006, Amaiya's blood-lead level had fallen to six micrograms per deciliter.

In December 2006, the grandmother renewed her lease. On this occasion, for the first time, Alexandra co-signed the lease.

In June 2007, Amaiya, by her mother and natural guardian, Alexandra, and Alexandra (hereinafter together the plaintiffs) commenced this action against the landlord. The complaint set forth two causes of action, one sounding in common-law negligence and the other alleging a violation of the RLPHRA. With respect to the RLPHRA cause of action, the complaint alleged that the landlord failed to disclose the presence of known lead-based paint and/or lead-based paint hazards, and failed to provide the plaintiffs with all records and reports pertaining to same. The complaint sought to recover damages on the first two causes of action, and also set forth a demand for punitive damages based upon the landlord's alleged "wanton and reckless" acts and omissions.

In March 2008, the landlord requested that the plaintiffs discontinue their RLPHRA cause of action, since only a

purchaser or lessee of an apartment had standing to assert such a claim.

In their verified bill of particulars, the plaintiffs alleged that the landlord had notice that the infant plaintiff resided in the apartment. In addition, the plaintiffs asserted that they were not alleging a single occurrence, but multiple occurrences and continuing exposure to lead-based paint and dust.

## The Landlord's Motion for Summary Judgment

By notice of motion dated September 28, 2009, the landlord moved, inter alia, for summary judgment dismissing the cause of action alleging a violation of the RLPHRA and the claim for punitive damages. In addition, the landlord sought to impose sanctions based upon the plaintiffs' refusal to discontinue their RLPHRA cause of action.

With respect to the RLPHRA cause of action, the landlord argued that the statute, which mandated disclosure of known information on lead-based paint and lead-based paint hazards, limited recovery for a violation of its provisions only to a "purchaser or lessee." The landlord noted that the grandmother was the lessee of the subject apartment, not the plaintiffs. The landlord asserted that the grandmother was identified on each of the lease agreements/renewals as the tenant-of-record and that she had executed each of those documents identifying herself as the "tenant." The landlord maintained that since Amaiya was not the "purchaser or lessee" of the apartment, she lacked standing to assert a cause of action under the RLPHRA. Accordingly, the landlord argued that the infant plaintiff's RLPHRA cause of action, as well as Alexandra's derivative claim, should be dismissed.

Regarding the claim for punitive damages, the landlord argued that it could not be proven as a matter of law that it acted with the requisite "high degree of moral culpability" or "willful or wanton" disregard for Amaiya's health and safety so as to support an award of punitive damages. The landlord asserted that it responded reasonably and expeditiously to abate the few isolated areas of alleged lead-based paint conditions. The landlord pointed out that all of the violations were abated by March 20, 2006, and that by May 22, 2006, the infant's blood-lead level had dropped to six micrograms per deciliter, a nonactionable level. In support of its motion, the landlord submitted, among other things, the deposition testimony, the Department of Health's reports, the lead tests, and the lease documents.

The Plaintiffs' Opposition

In opposition to the landlord's motion, the plaintiffs argued that they had standing to assert a RLPHRA cause of action inasmuch as the grandmother and the plaintiffs were a family unit that leased the subject apartment from the landlord. The plaintiffs asserted that the landlord was aware that the entire family resided in the apartment throughout the plaintiffs' tenancy. The plaintiffs contended that where, as here, a leasehold is involved, Amaiya's interests were clearly within the zone of interests protected by the statute. The plaintiffs claimed in this regard that, unlike a purchaser of real property, tenants have no substantive control over the maintenance of their leasehold. Surely, the plaintiffs asserted, the intent of the drafters of the RLPHRA was not to exclude children that were lead poisoned from seeking damages. According to the plaintiffs, if such were the case, landlords would have no incentive to adhere to the statute's disclosure requirements. The plaintiffs asserted that, as a matter of public policy, the cause of action under the RLPHRA should not be dismissed because protecting Amaiya was in accord with the class of persons the statute was intended to protect. Further, the plaintiffs argued that Alexandra had paid the rent since 2004, and that the landlord's acceptance of these rent payments made Alexandra a ''de facto'' tenant, thereby giving her standing to assert a cause of action under the RLPHRA. Lastly, the plaintiffs noted that Alexandra cosigned the December 2006 renewal lease for the purpose of becoming a tenant of record.

With respect to the issue of punitive damages, the plaintiffs argued that a triable issue of fact existed as to whether the landlord recklessly disregarded Amaiya's health and safety after the Department of Health found lead-based paint hazards and ordered the abatement on December 29, 2005. In this regard, the plaintiffs contended that the landlord took an excessive amount of time to correct the violations in the subject apartment. They asserted that an award of punitive damages was warranted not only to punish the landlord herein, but also to deter other landlords from engaging in similar conduct.

In support of their opposition, the plaintiffs submitted a list of building violations, some of which pertained to lead conditions in other apartments throughout the subject building. The plaintiffs also submitted the affidavit of William Saverese, an EPA certified risk assessor, who opined, in relevant part, that Amaiya ''was exposed to and ingested lead-based paint, includ-

ing paint chips containing lead and/or lead dust, that existed in the Subject Apartment . . . throughout the period of the infant's residence there until the Subject Apartment was cleared by [the Department of Health]." In addition, Saverese opined that Amaiya's exposure to and ingestion of the unlawful lead-based paint and lead-based paint hazards was a substantial contributing factor in causing her elevated blood-lead levels.

In further support of their opposition, the plaintiffs submitted an affirmation by Dr. Douglas Savino, a pediatrician, who opined that Amaiya was exposed to lead-based paint and that this was a contributing factor in causing certain cognitive deficits. Finally, Alexandra submitted an affidavit stating that she had been living in the apartment since the age of 12 and that there were always leaks in the ceiling resulting in chipping and peeling paint, both before and after Amaiya was born, and that numerous complaints had been made to the managing agent. She also stated that because of the lead poisoning, her daughter was hyperactive and had problems in school.

## The Supreme Court's Decision

On February 3, 2010, following oral argument, the Supreme Court issued a decision from the bench denying those branches of the landlord's motion which were for summary judgment dismissing the cause of action alleging a violation of the RLPHRA and the claim for punitive damages. The court concluded that a triable issue of fact existed as to whether Alexandra had standing to assert a claim under the RLPHRA. In addition, the court declined to dismiss the claim for punitive damages based upon the violation history annexed to the plaintiffs' opposition papers, which indicated that several years prior to Amaiya's testing positive for lead, the landlord was put on notice of lead violations in other apartments in the subject building.

## Order Appealed From

By order entered February 8, 2010, the Supreme Court denied those branches of the landlord's motion which were for summary judgment for the reasons stated in its decision.

## Analysis

### The RLPHRA

The RLPHRA was enacted in 1992 in response to Congressional findings that "low-level lead poisoning is widespread among American children, afflicting as many as 3,000,000 children under age 6, with minority and low-income communities

disproportionately affected," and "the health and development of children living in as many as 3,800,000 American homes is endangered by chipping or peeling lead paint, or excessive amounts of lead-contaminated dust in their homes" (42 USC § 4851 [1], [5]). The statute serves a number of purposes, including an intent to "eliminate lead-based paint hazards in all housing as expeditiously as possible," "encourage effective action to prevent childhood lead poisoning by establishing a workable framework for lead-based paint hazard evaluation and reduction," and "educate the public concerning the hazards and sources of lead-based paint poisoning and steps to reduce and eliminate such hazards" (42 USC § 4851a [1], [3], [7]).

To accomplish these objectives, section 4852d of the statute directs the promulgation of regulations "for the disclosure of lead-based paint hazards in target housing which is offered for sale or lease" (42 USC § 4852d [a] [1]). This disclosure provision requires, in pertinent part, that "before the purchaser or lessee is obligated under any contract to purchase or lease the housing," the seller or lessor "provide the purchaser or lessee with a lead hazard information pamphlet" (42 USC § 4852d [a] [1] [A]), and "disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards" (42 USC § 4852d [a] [1] [B]). The RLPHRA provides penalties for violations of the disclosure section (see 42 USC § 4852d [a] [1]; [b]). Specifically, with respect to civil liability, the statute provides that "[a]ny person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual" (42 USC § 4852d [b] [3]). The regulations implementing the statute define "lessee" as "any entity that enters into an agreement to lease, rent, or sublease target housing, including but not limited to individuals, partnerships, corporations, trusts, government agencies, housing agencies, Indian tribes, and nonprofit organizations" (24 CFR 35.86).

To determine whether the plaintiffs herein have standing to assert a claim under the RLPHRA, we first look to the plain language of the statute, "as that represents the most compelling evidence of the Legislature's intent" (*Matter of Tompkins County Support Collection Unit v Chamberlin*, 99 NY2d 328, 335 [2003]; *see Matter of Richardson v Richardson*, 80 AD3d 32, 37 [2010]; *Hudson Val. Oil Heat Council, Inc. v Town of Warwick*, 7 AD3d 572, 574 [2004]).

■ The plain language of the RLPHRA expressly limits recovery to a "purchaser or lessee" (42 USC § 4852d [b] [3]). This limitation is

> "consistent with the purpose of the disclosure provision—to provide the purchaser or lessee of target property with notice that there could be a lead-based paint hazard present in the subject premises, and the opportunity to either decline to enter into a contract regarding the premises or proceed forward with the transaction in the face of the knowledge that a lead-based paint hazard could be present" (*Mason ex rel. Heiser v Morrisette*, 403 F3d 28, 31 [2005], citing 42 USC § 4852d [a] [1]).

Moreover, since the statute's civil liability provision is located within the disclosure section, "it is both logical and reasonable to read the civil liability to cover only purchasers or lessees who were deprived of the required notice of lead hazards 'upon the transfer of residential property' " (*Gladysz v Desmarais*, 2003 WL 1343033, *2, 2003 US Dist LEXIS 4252, *8 [D NH 2003], quoting 42 USC § 4852d).

Applying the foregoing to the facts of this case, the landlord established its prima facie entitlement to judgment as a matter of law dismissing the RLPHRA cause of action by demonstrating that the plaintiffs did not have standing to assert this claim, as they were neither purchasers nor lessees of the subject apartment (*see generally Giuffrida v Citibank Corp.*, 100 NY2d 72, 81 [2003]). Our determination that the RLPHRA limits recovery to purchasers or lessees is not only consistent with the plain language of the statute, but also in accordance with case law. For example, in *Skerritt v Bach* (23 AD3d 1080 [2005]), the Appellate Division, Fourth Department, held that the plaintiff purchaser's minor son lacked standing to seek damages pursuant to the RLPHRA. The Fourth Department concluded that since the statute requires notice of lead-based paint hazards to potential purchasers or lessees and provides a means to avoid a purchase or lease agreement in the event that such hazards are present, it was "not 'consistent with the underlying purposes of the legislative scheme to imply' a remedy for plaintiff's son, who [was] not a purchaser or a lessee" (*id.* at 1081, quoting *Cort v Ash*, 422 US 66, 78 [1975]). Certain federal courts have similarly found that minor children do not have standing to sue a landlord under the RLPHRA (*see Mason ex rel. Heiser v Morrisette*, 403 F3d at 28 [lessee's minor children did not have

standing to sue a landlord under the RLPHRA because the plain language of 42 USC § 4852d (b) (3) limits recovery to a "purchaser or lessee"]; *Sabra ex rel. Waechter v Iskander,* 2008 WL 4889681, *3, 2008 US Dist LEXIS 91832, *9 [ND Ga 2008] [lessees could not assert a claim on behalf of a minor child for civil liability under the RLPHRA because the child was not a "purchaser or lessee"]; *L.B. III v Housing Auth. of Louisville,* 345 F Supp 2d 725, 729 [2004] [the plaintiffs, four minor children, could not state a claim under the RLPHRA "because they were neither purchasers nor lessees of the property in which they lived"]; *Gladysz v Desmarais,* 2003 WL 1343033, *2, 2003 US Dist LEXIS 4252, *8 [2003] [lessee's grandchildren could not maintain a cause of action under the RLPHRA, since "§ 4852d(b)(3) clearly limits recovery to a 'purchaser or lessee' "]).

In opposition to the landlord's prima facie showing of entitlement to judgment as a matter of law dismissing the RLPHRA cause of action, the plaintiffs failed to raise a triable issue of fact (*see Alvarez v Prospect Hosp.,* 68 NY2d 320, 324 [1986]).

The plaintiffs argue that the detailed Congressional findings set forth in the RLPHRA demonstrate that Congress intended to protect children from the dangers of lead poisoning. The plaintiffs contend that the approach to interpreting the statute undertaken by the Fourth Department in *Skerritt v Bach* (23 AD3d at 1080) led that court to a conclusion at odds with Congress's findings. The plaintiffs rely, instead, upon *McCormick v Kissel* (458 F Supp 2d 944 [2006]), in which the District Court (SD Ind) held that the infant son of the plaintiffs therein had standing under the RLPHRA (*id.* at 947-948).

In *McCormick,* the court found that Congress's emphasis in its findings on a need to protect children from lead-based paint hazards clearly indicated that the infant was within the "zone of interests" sought to be protected by the RLPHRA (*id.* at 948). However, although the language of the RLPHRA and the legislative history reflect an intent to protect children, the statute accomplishes this objective by mandating disclosure to the purchaser or lessee of any known lead-based paint, or lead-based paint hazards in the purchase, sale, or lease of target housing (*see* 42 USC § 4852d [a]; *Wallace v United States,* 335 F Supp 2d 252, 260 [2004] ["The purpose of the RLPHRA is to provide for the disclosure of lead-based paint hazards by impos-(ing) certain requirements *on the sale or lease* of target housing. By drafting the RLPHRA and its implementing regulations in

this manner, Congress and HUD chose to focus on the eradication of lead-based paint in the nation's housing stock by creating disclosure obligations that would be triggered at the time of sale or lease" (internal quotation marks and citation omitted)]). Indeed, "because a violation of the statute occurs when the seller or lessor fails to disclose, it is logical that the party harmed by the failure to disclose is the purchaser or the lessee" (*Mason ex rel. Heiser v Morrisette,* 403 F3d at 31). Therefore, contrary to the plaintiffs' contention, we conclude that the infant plaintiff is not within the zone of interests protected by the statute (*see Sabra ex rel. Waechter v Iskander,* 2008 WL 4889681, *4, 2008 US Dist LEXIS 91832, *11 [2008] [rejecting as "not persuasive" the reasoning in *McCormick* that the child of a lessee falls within the zone of interests sought to be protected under the RLPHRA]; *Skerritt v Bach,* 23 AD3d at 1081 [finding that the plaintiff's minor son was not within the zone of interests protected by the RLPHRA]).

■ The plaintiffs do not raise any specific argument on appeal with respect to their contention that Alexandra has standing under the RLPHRA. The plaintiffs argued before the Supreme Court that Alexandra was a "de facto tenant" by virtue of her payment of rent since 2004. However, this argument is without merit. As previously noted, the regulations implementing the statute specifically define a lessee as someone who "enters into an agreement" (24 CFR 35.86). Finally, Alexandra's cosigning of the lease in December 2006, after she had notice of the lead paint condition, was insufficient to confer standing upon her, as the lease was cosigned after the injury giving rise to the RLPHRA cause of action had occurred. Indeed, by May 2006, Amaiya's blood-lead level had fallen to six micrograms per deciliter (*see* Public Health Law § 1370 [6] [defining "Elevated lead levels" as "a blood lead level greater than or equal to ten micrograms of lead per deciliter of whole blood or such blood lead level as may be established by the department pursuant to rule or regulation"]; *Solis-Vicuna v Notias,* 71 AD3d 868, 869 [2010] [noting that a blood-lead level in excess of 10 micrograms per deciliter is considered poisonous]).

Accordingly, based on the foregoing, we conclude that the Supreme Court should have granted that branch of the landlord's motion which was for summary judgment dismissing the cause of action alleging a violation of the RLPHRA.

■ Finally, our determination that the plaintiffs lack standing to maintain a cause of action under the RLPHRA does not

mean that they are foreclosed from seeking recovery for injuries sustained as a result of exposure to lead paint and lead-based paint hazards. As has been noted, "the federal scheme to reduce the hazards of lead-based paint in residential housing is intended to be implemented in conjunction with state and local laws that require abatement of lead-based paint" (*Mason ex rel. Heiser v Morrisette,* 403 F3d at 32-33; *see* Administrative Code of City of NY former § 27-2013 [h], now §§ 27-2056.3, 27-2056.18 [requiring the owner of a multiple dwelling to remove or cover paint containing specified hazardous levels of lead in any apartment in which a child six years of age or younger resides]). In the instant case, the plaintiffs still may pursue their cause of action sounding in common-law negligence.

Punitive Damages

"An award of punitive damages is warranted where the conduct of the party being held liable 'evidences a high degree of moral culpability, or where the conduct is so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness' " (*Pellegrini v Richmond County Ambulance Serv., Inc.,* 48 AD3d 436, 437 [2008], quoting *Buckholz v Maple Garden Apts., LLC,* 38 AD3d 584, 585 [2007]; *see Shovak v Long Is. Commercial Bank,* 50 AD3d 1118, 1120-1121 [2008]).

 Here, the landlord established its prima facie entitlement to judgment as a matter of law dismissing the claim for punitive damages. The landlord demonstrated that it conducted renovations in the subject apartment, including replacing the bathroom sink, the bathroom floor, and the kitchen cabinets. Indeed, Alexandra identified the landlord's renovation of the bathroom floor from January through March 2005 as the potential source of the infant's exposure to lead. In addition, the landlord replaced kitchen appliances and repainted the entire apartment on multiple occasions. Moreover, the landlord commenced abatement procedures within a reasonable time after receiving the December 29, 2005 order to abate. Thus, the landlord demonstrated, prima facie, that its conduct was not "so gross, wanton, or willful, or of such high moral culpability, as to warrant an award of punitive damages" (*Outside Connection, Inc. v DiGennaro,* 18 AD3d 634, 634 [2005]; *see Munoz v Puretz,* 301 AD2d 382 [2003]).

In opposition, the plaintiffs failed to raise a triable issue of fact (*see Alvarez v Prospect Hosp.,* 68 NY2d at 324). The

plaintiffs' reliance on *Solis-Vicuna v Notias* (71 AD3d 868 [2010]) is misplaced. In that case, this Court found that the record supported the jury's award of punitive damages against the owners of an apartment where the infant plaintiffs were exposed to lead-based paint hazards (*id.* at 869-870). Significantly, the owners therein had received notice from the Department of Health in January 2001 that they were required to abate the lead paint in the subject apartment, yet they did not begin the abatement work until three months later in April 2001 (*id.* at 871). Moreover, a further inspection by the Department of Health in May 2001 revealed that the apartment still had not been adequately cleaned of lead dust (*id.*).

In this case, the Department of Health's records indicate that the landlord commenced abatement procedures within a reasonable time after receiving the order to abate. The inspection report dated February 7, 2006 reflected that only partial violations remained as of that date. Additionally, on February 8, 2006, the Department of Health contacted management to explain the remaining violations, and management indicated that it would follow up on the matter immediately. Thereafter, the landlord conducted further abatement work. By March 20, 2006, all violations had been cured.

Under the circumstances of this case, the "[p]laintiffs have failed to establish that there is anything unusual or extraordinary about [the landlord's] conduct which warrants punitive damages" (*Munoz v Puretz*, 301 AD2d at 384-385). Accordingly, the Supreme Court should have granted that branch of the landlord's motion which was for summary judgment dismissing the claim for punitive damages.

Accordingly, the order is reversed, on the law, and those branches of the defendant's motion which were for summary judgment dismissing the cause of action alleging a violation of the RLPHRA and the claim for punitive damages are granted.

DILLON, J.P., DICKERSON and HALL, JJ., concur.

Ordered that the order is reversed, on the law, with costs, and those branches of the defendant's motion which were for summary judgment dismissing the cause of action alleging a violation of the Residential Lead-Based Paint Hazard Reduction Act of 1992 (42 USC § 4851 *et seq.*) and the claim for punitive damages are granted.